HORACE WOODRUFF, MARION COX AND MORTON SMITH *v.*
THE STATE.*

(*Nashville,* December Term, 1931.)

Opinion filed July 2, 1932.

*As to responsibility for acts of co-conspirators, see 5 R. C. L., 1063; R. C. L. Perm. Supp., p. 1576.

On degree of homicide committed in perpetration of robbery, see 13 R. C. L., 776; R. C. L. Perm. Supp., p. 3413; R. C. L. Pocket Part, title Homicide, section 82.

As to admissibility of evidence of other crimes, see 8 R. C. L., 198 et seq.; R. C. L. Perm. Supp., p. 2214; R. C. L. Pocket Part, title Criminal Law, sections 194, 195; 10 R. C. L., 939; R. C. L. Perm. Supp., p. 2791; R. C. L. Pocket Part, title Evidence, sections 107-109.

On subnormal mentality as defense to crime, see annotation in 44 A. L. R., 586; 8 R. C. L., 64; R. C. L. Perm. Supp., p. 2167; R. C. L. Pocket Part, title Criminal Law, section 14.

532

J. D. B. DeBow for Woodruff.

E. D. Jackson and W. L. Schram, for Cox.

A. D. Tanner for Smith.

Nat Tipton, Assistant Attorney-General, for defendant in error.

Mr. Justice Swiggart delivered the opinion of the Court.

The three plaintiffs in error above named were jointly indicted in the Criminal Court of Davidson County for the murder of M. T. Mulvihill. On their joint trial they were found guilty by a jury of murder in the first degree, and the punishment of each of them was fixed in the verdict at death by electrocution. Judgment was rendered in accord with the verdict, from which the plaintiffs in error have prosecuted an appeal in the nature of a writ of error to this court.

No controverted questions of fact are presented by the record. There is no conflict in the evidence with regard to any material fact. The fact of the homicide, and that it was committed under circumstances amounting to murder in the first degree, is abundantly proven by eyewitnesses. The participation of all three plaintiffs in error is shown by the uncontradicted testimony of Morton Smith, corroborated as to each of his codefendants, Woodruff and Cox, by the written confession of each.

The inquiry on appeal is therefore directed to two questions: (1) Whether the uncontradicted evidence establishes the guilt of each of the plaintiffs in error of the degree of murder found by the jury; and (2) whether the verdict was reached at a trial in which the constitutional rights of the plaintiffs in error to a fair and impartial trial were properly safeguarded and protected.

Mulvihill, a policeman of the city of Nashville, was shot to death by Woodruff, while acting in the line of his duty, endeavoring to prevent a robbery at a store located at the corner of Clifton Road and 28th Avenue, in the city of Nashville. Notified that the robbery was in progress, Mulvihill and Cook, also a policeman, approached the store with pistols in hand. Mulvihill received a charge of shot in his breast from a sawed-off shotgun, fired by Woodruff, as he stepped on the porch of the store, and fell back to the ground. He died before he could be moved. He probably did not see his assailant, who was in the shadow. Cook exchanged shots with one McGuire, who was lurking against the east wall of the store, and inflicted on him a wound from the effects of which he subsequently died. Woodruff then wounded Cook with the second fire from the shotgun, and having thus disabled both policemen, Woodruff and McGuire left the scene in the automobile in which they had come.

Before the first shot was fired by Woodruff, Morton Smith had fled on foot, eluding the pursuit of Policeman Cook, and was about a block distant when Mulvihill was shot.

Cox stated in his written confession that he was the last of the three to leave the store, and that he "pulled on his gun" at one of the policemen but it would not shoot. He was unable to state how far he was from the store when the first shot was fired by Woodruff.

It is shown by the testimony of Smith, corroborated by the confessions of Woodruff and Cox, that the robbery of the occupants of the store at 28th Avenue and Clifton Road was not the result of a chance encounter of the four active participants. On the previous day they had agreed to embark together on a career of robbery under

the leadership of Woodruff. On the night in question they first possessed themselves of an automobile by robbery, at the point of a pistol, and then, having reinforced their arsenal of three pistols with the sawed-off shotgun, they proceeded together to the robbery of a store in East Nashville, and thence to the store where Mulvihill was killed. In each of the two store robberies the procedure was the same. Woodruff remained outside with the shotgun; McGuire rifled the cash drawer, while Cox and Smith covered the occupants of the store with pistols.

It is the contention of Cox and Smith that, since the killing of Mulvihill occurred while the four were making their get-away, Cox and Smith having in fact left the premises, the motive was personal to Woodruff, in aid of his own escape, and that the killing was not in furtherance of the conspiracy to commit the crime of robbery.

This contention presents primarily a question of fact, and the evidence is not controverted. Mulvihill was killed on the premises. He was on the porch of the store when he was shot, and he had come to prevent the consummation of the robbery. McGuire, who had rifled the cash register and who, presumably, was in possession of the fruits of the conspiracy, was still present, and the killing of Mulvihill was necessary to enable him, as well as Woodruff, to leave. There is no escape from the conclusion that it was for this purpose that the four had agreed Woodruff should take his position outside the store with the shotgun. We hold, as a finding of fact, that the shooting of Mulvihill is shown by the evidence to have been the direct result of the conspiracy to rob the store, contemplated by the four conspirators, and done in direct furtherance of its purposes.

 Because the shooting was done on the premises which were the scene of the robbery, the authority mainly relied upon by Cox and Smith, *People* v. *Marwig,* 227 N. Y., 382, 125 N. E., 535, 22 A. L. R., 845, is not applicable to the facts of the case before us.

It is the settled rule of law here, as well as elsewhere, that a killing by one of a party, in the pursuit of an unlawful purpose involving the use of violence in which all are engaged, is the act of all who had come to engage in the unlawful purpose. In such case the law presumes they had come "to make good their designs against all opposition." *Moody* v. *State,* 46 Tenn. (6 Cold.), 299; *Reagan* v. *State,* 155 Tenn., 400.

In the light of this general rule, we think it is of no material consequence that Cox and Smith were able to escape without shooting, while McGuire and Woodruff, cornered, shot their way out. The criminal responsibility of Cox and Smith for the murder done by their companion and coconspirator rests upon a more tangible and reasonable basis than mere presence, and something more than pedal agility is required to exculpate them from the wrong to which their unlawful conduct and mental cooperation had contributed. The brief of the State quotes from *People* v. *Nichols,* 230 N. Y., 221, 129 N. E., 883: "A conspirator cannot escape responsibility for an act which is the natural result of a criminal scheme which he has helped to devise and carry forward because, as the result either of fear or even of a better motive, he concludes to run away at the very instant when the act in question is about to be committed and when the transaction which immediately begets it has actually been commenced, as in this case." We think this statement inherently reasonable, and its truth self-evident.

■ Without material contradiction or conflict, either as to the evidence or applicable rules of law, each of the plaintiffs in error is shown by the record to be guilty of the crime of murder committed in the perpetration of robbery, which is murder in the first degree, as found by the jury.

Each of the plaintiffs in error moved the trial court for a severance and a trial separate from that of his co-defendants. Grounds of the motion were that the State was in possession of written confessions of guilt of each of them, containing statements competent only as against the individual confessor; and also that Woodruff had entered a plea of guilty, which made the issue as to him only one of the degree of his guilt and the proper punishment to be imposed.

■ On an appeal in the nature of a writ of error, this Court does not directly review the exercise of discretion of the trial judge in overruling these motions. But, the motion for a severance having been made and overruled, the inquiry here is whether the joint trial developed prejudice to one or more of the plaintiffs in error, so that the interests of justice require the setting aside of the verdict and the granting of a new trial. *Railroad* v. *Johnson*, 114 Tenn., 632.

■ Prejudice to the rights of the plaintiffs in error from the fact that they were jointly tried and convicted could only have resulted if a *bona fide* defense had been interposed for them. Since no evidence tending to refute the charge of guilt was offered by any of them, none of them was embarrassed in his defense by the fact that the others were being jointly tried. It may have been to the interest of each that he be tried alone, but the orders of the court are molded to protect rights,

and not merely the interests, of persons accused of crime. The State, as well as the persons accused, is entitled to have its rights protected, and when several persons are charged jointly with a single crime, we think the State is entitled to have the fact of guilt determined and punishment assessed in a single trial, unless to do so would unfairly prejudice the rights of the defendants. No such prejudice appears when the crime charged is the result of a clearly proven conspiracy against which no defense is offered in evidence.

Plaintiffs in error contend that it was error for the trial judge to admit in evidence against them proof of the robberies committed by them prior to that in the commission of which Mulvihill was killed.

These separate offenses were committed in furtherance of the conspiracy which was formed on the previous day. The acquisition of the automobile by robbery furnished the plaintiffs in error with the means of transportation to and from the robbery here involved, and the robbery of the East Nashville store preceded the other by a very short interval of time.

Evidence material to the issue under investigation in a criminal case is never rendered incompetent because it tends to show that the accused has committed other crimes. It is competent or incompetent according to whether it is relevant to the issue on trial and has probative value. If incompetent by that test, its tendency to show guilt of another offense may cause it to be prejudicial to the accused and therefore ground for reversal. But evidence competent because relevant is not rendered inadmissible merely because it is prejudicial to the accused. This is the rule to be deduced from the leading case of *Defrese* v. *State,* 50 Tenn. (3 Heisk.), 53,

long recognized as authority, wherein the Court said: "It may be safely assumed that whatever tends to explain or elucidate the charge in question, or to demonstrate the guilty connection of the parties therein, may be given in evidence though it may be a ground of another and distinct accusation. The intention to commit the crime is the essence of the offense, and that which illustrates the intention is always proper to be proven."

In *Mays* v. *State,* 145 Tenn., 118, 142, the Court said: "It is also admissible, where the crime charged is a part of a plan or system of criminal action, to offer evidence of other crimes near to it in time and of similar character, to show the knowledge and intent of the accused, and that the crime with which he is charged was not the result of accident or misadventure."

We think the fact of the formation on the previous day of the conspiracy to rob, and the full record of the movements and acts of the conspirators from the time of their assembly on the night the murder was committed, were competent evidence as tending to elucidate and color the act of murder. All such facts were closely related as to time and intent to the murder of Mulvihill, and tended to establish the existence of a fixed and determined purpose on the part of each of the plaintiffs in error both to rob and to kill, if the latter should be found necessary to accomplish the former. The general course of crime upon which the plaintiffs in error embarked on the night of this murder tended to establish and fix criminal responsibility in Cox and Smith for the act of Woodruff, and was the setting and environment characterizing and elucidating the homicide, competent to be considered in fixing the punishment of all persons criminally responsible therefor.

█ It is assigned as error that the several written confessions were improperly admitted in evidence because not shown to have been made voluntarily, without the influence of promise or threat.

This question is not made for Woodruff, in view of his plea of guilty. It is not open to Smith, who testified before the jury, admitting the facts we have held sufficient to establish his guilt, and making no claim that his confession was not voluntary and free from undue influences.

The stenographer or secretary who wrote down the confession of Cox testified that it was freely and voluntarily made, in so far as anything was said or done at the time the confession was actually made, and the writing, signed and sworn to by Cox, contains the statement that it was made of his own free will, without threat or promise. The trial judge offered to hear Cox in the absence of the jury, at the conclusion of the evidence of the State, with reference to the competency of the confession, but Cox did not avail himself of the opportunity then to repudiate the statement as not having been made freely and voluntarily according to its purport. Upon these facts we think the assignment without merit, and it is overruled.

And since Cox did not offer any evidence against the competency of the confession, when given the opportunity in the absence of the jury at the close of the State's evidence, we think his assignment of error is without merit that the trial judge refused to hear evidence on that point when his confession was first offered in evidence. There is nothing whatever on the record to even suggest that Cox had any evidence which would have impeached the confession, and the question of procedure seems to be presented as a pure technicality.

A number of assignments of error are made for Cox and Smith, criticising the accuracy of the instructions of the trial judge to the jury, particularly with reference to the statement of the State's theory of facts as showing their responsibility for the shooting by Woodruff, and the principles of law bearing on this question.

We think the instructions on these points submitted the case to the jury with admirable clarity and accuracy, and find no merit in these assignments of error. Reasons hereinabove assigned for our conclusion that the evidence establishes the guilt of Cox and Smith are a sufficient answer to the criticisms of the substance of the charge.

 For each of the plaintiffs in error it is contended that the charge contains prejudicial and reversible error in the instruction with reference to the duty and power of the jury, in fixing the punishment for murder in the first degree.

The instruction given is: "If you convict the defendants or either of them of the crime of murder in the first degree, the law fixes his or their punishment at death by electrocution unless the jury finds mitigating circumstances. Then you can fix his or their punishment at confinement in the penitentiary of the State for life or for any period of time over twenty years. Should you convict the defendants or either of them of this offense, you will in your verdict fix the penalty in accordance with the law just stated."

The statute in force at the date of the trial, Acts 1919, chapter 5, provides that when any person is convicted of murder in the first degree, "it shall be the duty of the jury convicting him in their verdict to fix his punishment, which punishment shall be death in the mode pre-

scribed by law for the infliction of the death penalty in capital cases, or the jury may, if they are of opinion that there are mitigating circumstances, fix the punishment at imprisonment in the penitentiary for life, or some period over twenty years."

The complaint is that in the case before us the jury were told that they might fix the punishment of the plaintiffs in error at a term of imprisonment if they should "find" mitigating circumstances, while the language of the statute is that they might so act if they should be "of opinion" that there were mitigating circumstances in the crime.

While it is best to follow strictly the language of such a statute, and unsafe to depart therefrom, we are not persuaded that the instruction complained of was otherwise than in accord with the statute. The legislature expressly directed that the jury should assess the death penalty unless they should be of opinion that the crime was attended by mitigating circumstances. The jury could only reach such opinion by a consideration of the evidence and upon a finding of facts creating such opinion. To say that the jury may "find" mitigating circumstances and may be "of opinion" that there are mitigating circumstances are equivalent expressions, and, in our opinion, the authorized reduction of punishment would have been no more likely if the language of the statute had been used instead of the expression complained of.

Other questions are made by assignments of error filed in behalf of Woodruff alone.

As stated hereinabove, a plea of guilty was interposed for him and his defense was an effort to prevent the imposition of the maximum penalty. An ap-

plication for a continuance of the trial was made, in order that he might have the benefit of the testimony of his aged mother, then too ill to attend court, by whom alone he might show a history of mental deficiency and idiosyncrasy since childhood as tending to mitigate his offense.

There was no showing on the application for a continuance that the illness of Woodruff's mother was of such recent occurrence that her deposition might not have been taken, and we doubt that the bare inability of the witness to attend court is sufficient to establish an abuse of discretion on the part of the trial judge. However, it was stated at the bar of this court that the woman has since died, so that if the ruling of the trial judge was error it cannot now be corrected by the granting of a new trial. The death of the witness has rendered the question moot.

 During the interval between the date of the murder of Mulvihill, May 9, 1931, and the date of the trial, August 4, 1931, Woodruff was committed to the custody of the Central State Hospital for observation. Dr. Farmer, the superintendent of that institution, an expert on mental conditions, was the only witness offered for Woodruff. The substance of his testimony, based upon his personal observation of Woodruff as well as that of the professional members of his staff, appears in the following quotation:

"A. We did not make up our opinion from any one thing but made our diagnosis from the history of his life, plus our present findings and we are unanimous in our opinion that the said Horace Woodruff is not medically insane but is a mental defective. Why do we say he is mentally defective—because he gives a history of not

learning and having trouble in school, and having to repeat the third grade, and having been expelled from school.

"Q. Doctor, do you think the boy knows right from wrong?

"A. While he knows right from wrong, he has neither the mental capacity, judgment, nor the strength of character to go right and be a good citizen.

"Q. You think he is mentally. defective?

"A. From the history of this man's life, he has been an antisocial individual from early childhood and taking all of the above into consideration we are forced to subscribe under oath that the said Horace Woodruff is not medically insane, but is a mental defective."

No specific reference was made to this testimony of Dr. Farmer in the instructions to the jury, nor did the charge include a statement of any theory of the case as advanced by Woodruff. No request for instructions was made for him.

It is assigned as error that the trial judge should have instructed the jury to consider this evidence of Woodruff's mental deficiency in determining whether there were mitigating circumstances justifying confinement rather than execution as punishment for Woodruff.

We are strongly inclined to the view that, in the absence of a special request from Woodruff's counsel, it was proper that the trial judge refrain from calling the attention of the jury to the testimony of Dr. Farmer. A jury of laymen are not likely to attach weight to the opinions of a psychopathist with respect to the degrees of mental development as affecting responsibility for crime. A layman will recognize the description by Dr. Farmer of a confirmed and irredeemable criminal in the

words: "While he knows right from wrong, he has neither the mental capacity, judgment, nor the strength of character to go right and be a good citizen. From the history of this man's life, he has been an antisocial individual from early childhood."

There is no legal definition, either statutory or judicial, of the phrase "mitigating circumstances," as used in the statutes relating to murder. A judicial definition would tend to limit its application, and perhaps for that reason this Court has not undertaken it. Under the former practice, when juries were authorized to report mitigating circumstances in their verdicts, upon which the trial judge could impose imprisonment rather than death as punishment, the finding of mitigating circumstances was treated as amounting to a recommendation to mercy which might be regarded or rejected. *Greer* v. *State,* 62 Tenn. (3 Baxter), 321, 324.

The case just cited states the practice followed under former statutes, to refrain from advising juries what would amount to mitigating circumstances. The Court said: "In determining whether, in their opinion, there are mitigating circumstances, the jury are left entirely to their own discretion. They are not told by the Judge what would be mitigating circumstances. It would possibly be error for the Judge to attempt to do so, as this would be to limit the jury on this point to such circumstances as the Judge might indicate; whereas, the Statute leaves the matter to the jury without restriction."

Upon this authority we think it was the duty of the trial judge to do no more than he did, advising the jury of the power vested in them by law to assess the punishment at confinement in the penitentiary if they found mitigating circumstances. To have said more would

have probably been to the prejudice of the plaintiff in error, in view of the evidence in the case. No theory consistent with the evidence and the law could have been framed by the judge which would have been likely to benefit Woodruff.

 No principle of law recognizes mere mental deficiency, which we understand to characterize an intelligence less in some degree than the average or normal, as either excusing or mitigating a deliberately planned and executed crime.

We have found in the record no ground for interference with the judgment of the trial court, and that judgment is accordingly affirmed. The judgment to be entered on the minutes of this Court will fix Thursday, August 18, 1932, as the date of execution.

MR. JUSTICE COOK concurs in the conclusions of law and fact stated in the opinion of the Court, but because plaintiffs in error Cox and Smith had fled and were not on the premises when Mulvihill was killed by Woodruff, he is disposed to recommend to the Governor that the punishment of Cox and Smith be commuted to imprisonment for life, by the exercise of executive clemency.