STALLARD *et al. v.* STATE.

(*Knoxville*, September Term, 1948.)

Opinion filed December 11, 1948.

RAY H. JENKINS, of Knoxville, C. W. MARGRAVES, of Rogersville, and JOHN R. TODD, JR., of Kingsport, for plaintiffs in error.

NAT TIPTON, Assistant Attorney-General, for the State.

MR. JUSTICE PREWITT delivered the opinion of the Court.

The defendants, Roy Stallard and Garrett C. Alvis, Jr., were convicted of the murder of Alvin Rentfro, their conviction being for murder in the first degree, with the punishment of each fixed at 99 years in the penitentiary. Both parties have appealed to this Court, but Stallard only has filed assignments of error. The case as to Stallard has been argued at the bar and fully presented.

The deceased was a young man who lived at Cleveland, Tennessee, and was associated with his brother in the sale of used cars. On the night of November 30, 1947, he left Cleveland to go to Roanoke, Virginia, to buy some used cars. His brother talked to him over long distance telephone about 12:30 on December 1, 1947. While in Roanoke he bought a gray Ford coupe from the witness Lee Crist. After completing this transaction with Crist, he carried the latter to his destination in Roanoke, and this was the last time he was seen alive by any of the witnesses testifying for the State. This

gray Ford coupe furnishes the principal link of identification of Stallard and Alvis with this crime. The identity of the Ford coupe was established through the motor numbers.

On the morning of December 10, 1947, the body of the deceased was fished out of Cherokee Lake near the bridge crossing at Morristown. He had been shot twice, once in the back and again in the temple. On the concrete railing of this bridge there were found blood stains. The finding of the body occurred after Alvis had been arrested and had made a statement to the officers in which he described the crime, gave its location, and told where the body probably could be found.

Stallard was a former deputy sheriff of Sullivan County, and was the owner of a dark Mercury car which had a siren on it. At this time he was in a distressed financial condition, and without the knowledge of his brother, Stallard had executed a mortgage on an automobile belonging to the former to secure the payment of a note at one of the local banks. Likewise, he had a cold check out for $500 which had been turned down by the bank for want of sufficient funds, and he also owed a considerable sum on his Mercury car.

The proof discloses that on the afternoon and night of December first Stallard had been looking for Alvis and finally found him. Martin Alvis, uncle of young Alvis, testified that on this same afternoon he loaned Stallard a blue steel .38 Smith and Wesson pistol.

The proof also discloses that about 11:30 on December first Stallard and Alvis were found together. Returning northwardly from what is known as the Rotherwood Bridge across the Holston River and which is the bridge over which highway 11-W crosses that stream, there runs

a road along the Hawkins County side of this stream. A bus operated to carry workers to and from the Tennessee-Eastman plant at Kingsport runs over this road for a portion of its route. This bus leaves the plant in Kingsport at 11:20 p. m., and the proof is that it generally runs along this road from 11:30 to 11:35. On the night of December 1, 1947, this bus was making its customary trip and went off on this side road for a distance of about 300 yards where two cars were parked, one partially blocking the road, and on account of the road being narrow, according to the testimony of bus driver, he was forced to stop to get around them. The bus driver testified that he and some of the occupants of the bus identified the two defendants as being there, and also identified the Mercury car of Stallard and the gray Ford coupe. These cars were moved by one or both of the defendants in order for the bus to pass.

At a time fixed at about 1:30 a. m. on the same night, Stallard, in his Mercury car accompanied by another party, went to a filling station at Kingsport and purchased some gasoline in a can. The attendant at the filling station testified that Stallard was the man who got out of the car, bought the gas from him and put up a dollar deposit on the can; that about 30 or 45 minutes later Stallard appeared, returned the can, took up his dollar deposit and then spent this dollar for gasoline to be placed in his Mercury car. Shortly after leaving the filling station, Stallard and Alvis seem to have gone to the home of a man by the name of Clevenger, a used car dealer, and obtained permission to leave a car in his parking lot. Clevenger did not recognize the parties, but Stallard admitted that he and Alvis took this car to this place and later went to a motel at Kingsport, where Alvis

registered under an assumed name, and they spent the remainder of the night there.

Between 8 and 9 o'clock on the morning of December 2, 1947, Stallard and Alvis appeared at Clevenger's place of business, and Stallard made the statement to Clevenger that he had bought this gray Ford coupe from a man named Edward Rice for $1,750 cash and prevailed upon Clevenger to go with him and Alvis to Atlanta, Georgia, to sell the car. While at Clevenger's place of business Stallard produced a purported bill of sale for this car from one Edward Rice to him and procured Mrs. Clevenger, a notary public, to notarize this bill of sale, although no person by the name of Edward Rice was present. The motor number in this bill of sale corresponds to that of the car sold to the deceased in Roanoke on the previous day.

The three men started from Kingsport to Georgia in this gray Ford coupe and in Stallard's Mercury. The gray Ford coupe had Nebraska license plates on it, and they stopped at Dandridge and Stallard went to the office of the county court clerk and purchased in his own name Tennessee license plates for this gray Ford coupe. They stopped just outside of Dandridge, removed the Nebraska plates, and put on the Tennessee plates. They carried this car to Thomaston, Georgia, and sold it for $1,800. Stallard admitted that the check for the sale of this car was made payable to him and that on the next morning he went to the bank, in company with the maker of the check, and obtained payment on it.

On the return from Atlanta, Clevenger testified that after they had reached Kingsport, Alvis turned over to him two pistols—one the blue steel .38 pistol which Martin Alvis testified he had loaned Stallard on the evening of

December first, and the other a nickel-plated revolver. Clevenger further testified that about the next day Stallard came to his house and got the two pistols.

The prolonged absence of the deceased from his home evidently gave rise to inquiry and an investigation was made. The officers seem to have called in the FBI, as well as relying upon their own efforts. Obviously, the officers ascertained that the deceased had purchased this car in Roanoke, and the investigation seems to have covered Roanoke as well as Thomaston, Georgia. As a result of this investigation, Stallard and Alvis were both arrested. Alvis made two written statements to the officers at variance with each other. Stallard also made a statement to the officers at variance with his testimony and the testimony of other witnesses in the case. In this statement Stallard claimed that he traded with Edward Rice for this gray Ford coupe and that Rice accompanied him to Clevenger's store and there Rice signed the bill of sale in Mrs. Clevenger's presence and she notarized it; that after riding around for a while in this gray Ford coupe, they parked it, and then he and Alvis went to Johnson City, where they remained until 3 or 4 a. m. when they returned to Kingsport, and that he spent the remaining part of the night there.

Upon hearing Alvis' version of the homicide, which, of course, was not admissible against Stallard, the officers went to the point where Alvis stated that the homicide was committed and which was the same place where the witnesses in the bus had seen the two defendants about 11:30 on the night of December first; and, according to Mr. Upchurch, one of the officers who was making the investigation, they found some blood and also on a tree found a bullet mark. A photograph of this tree

with a bullet in it appears as an exhibit in the record, and it can be seen from the photograph that the bullet mark is of recent origin. A short distance away, the officers found where a fire had been built and rubber had been burned. About two miles away they found exploded shells which had been fired from a .38-caliber pistol. These, together with the bullet taken from the head of the deceased and the bullet taken from the tree at this point, were sent to the laboratory of the FBI in Washington. From the testimony of one of the FBI agents it appears that the bullets were so battered that the particular weapon from which they had been fired could not be determined by microscopic tests, but the three empty cartridge shells were definitely determined as having been fired from this blue steel .38 pistol which Martin Alvis testified he loaned Stallard on the afternoon of December first. It could be determined, however, that the bullets were fired from a .38-caliber pistol, but since the nickel-plated pistol which Alvis owned was likewise of that caliber, it was impossible to state with any degree of accuracy as to which of these pistols fired these bullets. Samples were also taken from the cardboard lining of the trunk of this gray Ford coupe and some refuse and particles of brown stain scraped from the floor thereof and sent to the FBI. Tests made upon these definitely disclosed that they contained human blood, although there was not enough blood in this refuse for the laboratory experts to determine the type of blood and compare it with that of the deceased. It might be well to state here that the parties on their trip to Thomaston, Georgia, stopped at Marietta, Georgia, and purchased a new floor mat for the trunk of this gray Ford coupe. Clevenger, who saw the trunk opened at Thomaston, testified that it

was in bad condition; that the floor mat did not fit and a rebate of $25 was finally agreed upon between the parties on account of the condition of this trunk.

The testimony of Stallard is a general denial of most of the incriminating circumstances adduced against him on behalf of the State. He denied ever having borrowed a blue steel pistol from Martin Alvis. He testified that at some time he had been figuring with one Ralph Darnell, who had recently erected a house but without electric lights therein, to wire his house for him; that on this night he was looking for Alvis but that it was not in connection with the wiring but in connection with a collection which he was trying to make from him; that after he located Alvis the latter wanted him to carry him to Rogersville, and when he refused, Alvis then asked him to carry him to the Chicken Hut, a restaurant in Kingsport, only four or five blocks from where the parties were at the time of this discussion; that then Alvis asked for the loan of his car for a short time and he agreed to let him have it if he would take him to the home of Ralph Darnell, some five or six miles distant in Hawkins County, so that he might figure on this electric wiring; that Alvis took him to the Darnell home, arriving between 7 and 8 p. m., and then Alvis left with his car.

Stallard further testified that he remained at the Darnell home until about 1:30 a. m. and hearing a car blow he went out and saw his car and a gray Ford coupe and he saw only Alvis at the scene; that he returned to the Darnell home to get his coat and hat and while doing so Alvis drove off in the gray Ford coupe; that he went out and got in his own car and started toward his home and had gotten some distance from the Darnell home when Alvis passed him in this gray Ford coupe and blew

his horn; that he then stopped and Alvis asked him to go to Clevenger's with him to get Clevenger to go to Atlanta with them the next day to sell this car; that they proceeded to a point near the Holston Ordnance Works, where Alvis claimed he was out of gas; that they then went to this filling station about 2:30 and they got gas; that Alvis was the one who made the purchase and he claimed he did not leave the car.

Stallard claimed that before they went to Clevenger's the next morning, Alvis asked him to handle the sale of this car in his own name because he was in debt to Clevenger, a fact shown to be true in the record, and that for this reason he had Mrs. Clevenger notarize this bill of sale to him; that he made the statement that he had bought this car from Rice, registered it in his name in Dandridge, and had the check made payable to him and cashed the check himself. He also claimed that he gave Alvis the money which he received on this check while they were at Thomaston, Georgia. The reason given by Stallard for buying these license plates is that Alvis had given him $30 for the expenses of the trip and he bought the license plates out of this, and he also claims that later he gave Alvis $5 to pay for gas for the Mercury on the return trip. He denied taking these pistols from the Clevenger home as the Clevengers testified.

Ralph Darnell testified that Stallard came to his home about dark on the evening of December first to discuss with him the wiring of his house and remained there until between 1 and 2 a. m. He further testified that when a car drove up between 1 and 2 o'clock he went to the door and saw two cars—one a dark one and the other a light-colored car—and that one left before the other one.

It is insisted by Stallard that the trial judge was in error in not granting him a severance at the trial; that the defense of his codefendant Alvis was wholly antagonistic with his defense and position; that the effect of introducing the confession of Alvis, although it could not be used as evidence against him, was nevertheless very prejudicial to him; and, further, that if the severance had been granted the confession of Alvis would not have appeared or been introduced in a separate trial, and without such confession the other circumstances and evidence produced on the trial by the State was wholly insufficient to warrant his conviction.

It is further insisted by Stallard that he had no opportunity of cross-examining his codefendant Alvis; that from the beginning of the trial, and in fact ever since the alleged murder had been committed, the attitude of Alvis toward him had been very antagonistic; that on the trial of the case Alvis did not testify, and the attorneys for Alvis undertook to cross-examine him and all his witnesses to the end that all the blame for said alleged crime was placed on him and not on Alvis.

Stallard further contended that it would have been disastrous and very prejudicial to his rights for him to have called Alvis as a witness on his behalf, because he would have been bound by the statements of Alvis on all material matters; that while the trial judge charged the jury that the so-called confession of Alvis was not to be used against him, yet the very reading of this confession to the jury was not only prejudicial to his interests but to his constitutional rights. Stallard further contended that the alleged confession of Alvis had a tendency to highly dignify and make much more impressive the isolated circumstances, as shown by the detailed statement

of the circumstances hereinbefore referred to in this opinion.

Stallard's insistence is that the rule of severance recognized in *Woodruff et al.* v. *State*, 164 Tenn. 530, 51 S. W. (2d) 843, and *Thompson et al.* v. *State*, 171 Tenn. 156, 101 S. W. (2d) 467, has no application here.

The rule in this State is that the trial judge will not be put in error for his failure to grant a severance, where the defendant was not prejudiced by the refusal and the trial judge did not abuse this discretion. Stated in another way, this Court will not place the trial court in error where it appears that the rights of the defendant were not prejudiced, the affirmative of which would be an abuse of discretion.

In *Woodruff et al.* v. *State*, 164 Tenn. at pages 538, 539, 51 S. W. (2d) at page 845, *supra*, the Court said: "Prejudice to the rights of the plaintiffs in error from the fact that they were jointly tried and convicted could only have resulted if a *bona fide* defense had been interposed for them. Since no evidence tending to refute the charge of guilt was offered by any of them, none of them was embarrassed in his defense by the fact that the others were being jointly tried. It may have been to the interest of each that he be tried alone but the orders of the court are molded to protect rights, and not merely the interest, of persons accused of crime. The state, as well as the persons accused, is entitled to have its rights protected, and, when several persons are charged jointly with a single crime, we think the state is entitled to have the fact of guilt determined and punishment assessed in a single trial, unless to do so would unfairly prejudice the rights of the defendants."

In the instant case Stallard took the witness stand and denied any participation in the murder and undertook to set up the defense of an alibi.

In *Thompson et al.* v. *State, supra,* it appeared that counsel for Thompson and Scott were given every opportunity to cross-examine Oakley that they would have had under a separate proceeding.

In the two cases cited above it appears that in the first-mentioned case there was no real defense offered, and in the second-mentioned case the defendant seeking a severance had every opportunity to cross-examine. Such is not the case here. Stallard had no opportunity whatever to cross-examine Alvis, as the latter did not take the stand. The attitude of Alvis being wholly antagonistic, Stallard could not make Alvis his witness as he would have been bound by his statements.

In 23 C. J. S., Criminal Law, sec. 935, it is said: "If one of several defendants jointly indicted has made admissions or confessions involving another defendant, the court may, in its discretion, order a separate trial, so that the admissions or confessions, while evidence against the one, may not prejudice the other, and where the circumstances are such that an instruction to disregard the confession of one when considering the guilt of another would prove ineffective to eradicate the impression on the jury the severance should be granted, unless the prosecuting attorney expressly declares that such statements will not be offered in evidence on the trial, or unless all reference to the moving defendant is eliminated from the confession."

We cannot escape the conclusion that the instruction of the trial court to the jury that they should not consider the statement of Alvis as evidence against

Stallard was ineffectual. The statement given by Alvis to the officers on December 10, 1947, directly charged Stallard with the brutal murder of Rentfro, in which he declared that he saw Stallard deliberately shoot the deceased in the back twice with a pistol on the bank of the Holston River; that he (Alvis) did not participate in the murder of Rentfro, but that he did start to shoot Stallard for the murder of the deceased. In this statement Alvis further stated where the three empty shells could be found on the road and also where the body could be found in Cherokee Lake some miles distant from the place of the killing. There are other statements made by Alvis than this statement which not only affected the interests of Stallard but affected his constitutional rights, and we cannot see how Stallard could receive a constitutional trial without the opporunity of cross-examining Alvis where the State undertook to read this highly damaging statement to the jury. It may be stated that in all probability the jury would have convicted Stallard of the highest degree of murder in the absence of this written statement of Alvis. This is highly problematical. We cannot afford to speculate on the constitutional rights of Stallard, no matter what our opinion should be after weighing all the facts and circumstances.

Alvis did not testify but did file his bill of exceptions. However, he did not assign errors, and in such case it is necessary for us to render such judgment on the record as the law demands. Williams Code, sec. 11810.

The judgment of the lower court is affirmed as to Alvis, but the case is reversed and remanded for a new trial as to Stallard.

All concur.