JAMES K. TOMLIN, JOHN LESLIE REED, and

JOHN WESLEY REED

*v.*

STATE OF TENNESSEE.

(*Nashville,* December Term, 1959.)

Opinion filed September 9, 1960.

DAVE ALEXANDER, Franklin, JOHN J. HOOKER, Nashville, for plaintiffs in error.

THOMAS E. FOX, Assistant Attorney General, for the State.

MR. JUSTICE FELTS delivered the opinion of the Court.

Defendants below, James K. Tomlin, John Leslie Reed, and John Wesley Reed, were jointly indicted, tried, and convicted of robbery accomplished by use of a deadly weapon, and each was sentenced to serve 21 years and one day in the State Penitentiary. They have appealed in error and have separately assigned errors.

Evidence for the State was that J. W. Coffey and his wife, Hattie Coffey, lived in a rural neighborhood in Marshall County Tennessee. He was a farmer and they had in their home a safe in which they regularly kept large sums of money. The amount in the safe on the day of the robbery, December 8, 1958, was in excess of $78,000, consisting of four $1,000 dollar bills, several $500 bills, and the rest in bills of smaller denominations.

On that day Mr. Coffey was not at home. The only persons there were Mrs. Coffey and Mrs. Annie West, a neighbor. At about 1 p.m. three men in a blue-gray Ford pick-up truck drove up to the gate and stopped. One of them got out, came to the door, and asked Mrs. Coffey if the telephone was "out of order". She said, "No"; he then asked if Mr. Coffey was there, or if there were any other Coffeys around. On being answered in the negative, he said he wanted to use the telephone, and was admitted into the room where Mrs. Coffey and Mrs. West were.

He then drew a pistol and said: "This is a hold-up." He took Mrs. West's pocketbook in which she had a .38

caliber revolver. He made Mrs. Coffey and Mrs. West get down on the floor and lie there. He threw a bedspread over them, disconnected the telephone, and told one of the men in the truck to come in; whereupon the man came with a sledge hammer. The outer door of the safe was not locked. These two men forced open the inner door and took the drawer containing more than $62,000.00.

Meanwhile, the third man waited in the truck until the other two returned with the money, and they drove away in the truck. On the trial, each of defendants was identified as participants in the robbery. According to the testimony of Mrs. Coffey and of Mrs. West, the man who first entered was Defendant John Leslie Reed, and the man who later came in with the sledge hammer was Defendant James K. Tomlin; and the young man who waited in the truck was Defendant John Wesley Reed.

John Wesley Reed, prior to the trial, stated to T.B.I. agents that for his part, he "got about $9,000.00 from the money that was taken from who I later learned was Mrs. Coffey"; and that he had put part of this money in a sock and hidden it in the home of his grandmother. This statement was reduced to writing by the agents and signed by him. On going to his grandmother's home, the officers found there the sock containing about $6,500 in bills.

Some $1,450 in currency was found by the officers in Defendant Tomlin's home. This money, and also the money found at the grandmother's home, was in bills which, Mr. Coffey said, had the same "musty smell" as the inside of his safe, and some of these bills also had marks on them like the marks that had been made on bills

by paper clips and rubber bands with which he had fastened together stacks of bills in his safe.

John Wesley Reed testified as a witness for himself on the trial. He said he was only 18, admitted making the statement to the T.B.I. agents, and freely admitted taking part in the robbery, but did not implicate either of the other two defendants in the crime.

He testified that on the morning of December 8, 1958, at a pool room in Franklin, Tennessee, he saw two men who asked him to drive a truck for them, which he agreed to do; that he knew one of them to be Dock Parrish, who formerly lived in Franklin, but did not know the other man, except as Parrish called him "Mack." And he detailed how they went to the Coffey home, and he waited in the truck while the other two went in and got the money.

Each of the other two defendants testified on the trial and denied any part in or knowledge of the robbery. Each relied on an alibi, offering evidence which, if believed, accounted for his doings on the day in question and showed he could not have been at the scene of the crime, but obviously, as shown by their verdicts, the jury did not accept such evidence.

We need not further detail the evidence, since there is no assignment of error upon the evidence, no question as to its sufficiency, and no claim that it does not support the verdicts, or that it preponderates against the verdicts of guilt in favor of the innocence of the accused.

Defendant James K. Tomlin insists that the Trial Judge committed reversible error in refusing to grant him a severance or separate trial, because his co-defend-

ant Reeds were father and son and the son, prior to the trial, had confessed the crime charged, and because the Reeds had later been charged in Texas with a Federal offense of passing counterfeit currency of the United States; and that by those matters he was highly prejudiced in his defense by being put to trial jointly with the Reeds.

Defendant John Leslie Reed insists that the Trial Judge committed reversible error in refusing to grant him a severance, because his son and co-defendant, John Wesley Reed, had confessed the crime, and their defenses were antagonistic; and that for these reasons he was greatly prejudiced in his defense by being put to trial jointly with his co-defendants.

█ The test of whether one charged with a joint crime is entitled to a severance is whether he would be unfairly prejudiced in his defense by being put to a joint trial. In *Woodruff v. State*, 164 Tenn. 530, 538, 51 S.W.2d 843, 845, it was said:

"It may have been to the interest of each that he be tried alone, but the orders of the court are molded to protect rights, and not merely the interests, of persons accused of crime. The state, as well as the persons accused, is entitled to have its rights protected, and, when several persons are charged jointly with a single crime, we think the state is entitled to have the fact of guilt determined and punishment assessed in a single trial, unless to do so would unfairly prejudice the rights of the defendants."

This statement has often been approved in our later cases. One of such cases was *Thompson v. State*, 171 Tenn. 156, 171, 101 S.W.2d 467, 472. It was there said

that the granting of a severance is largely within the discretion of the Trial Judge, and his exercise of such discretion will not be reversed, "unless it appears that the defendants were clearly prejudiced thereby."

Some of our later cases approving and applying this test are: *Turner v. State,* 187 Tenn. 309, 316, 213 S.W.2d 281; *Stallard v. State,* 187 Tenn. 418, 427-428, 215 S.W.2d 807; *Stanley v. State,* 189 Tenn. 110, 118, 222 S.W.2d; 384; *Dykes v. State,* 194 Tenn. 477, 479, 253 S.W.2d 555; *Kirkendoll v. State,* 198 Tenn. 497, 522-523, 281 S.W.2d 243.

■ As above stated, John Wesley Reed's confession did not implicate either of the other two defendants. On the contrary, his testimony, if believed, tended to exculpate both of them, by showing that his accomplices were two other men—Dock Parrish and the man whom Parrish called "Mack." Nor was there any antagonism between his defense and the defenses of the other two defendants.

■ Nor do we think there is any merit in Tomlin's claim to a severance based on the alleged charge against the Reeds for counterfeiting in Texas. All that we find in the record about this is the affidavit of Tomlin that, to the best of his "knowledge, information and belief," the Reeds had been arrested upon such a charge in Texas. This, we think, was insufficient to entitle him to a severance.

So, upon the above authorities and in the light of these facts, we think that the Trial Judge did not err in overruling the motions of Tomlin and of John Leslie Reed for a severance; that the record fails to show that either was, or could be, unfairly prejudiced by being put upon a joint trial; and that in a case like this the State was

"entitled to have the fact of guilt determined and punishment assessed in a single trial" (164 Tenn. 539, 51 S.W. 2d 845).

All the rest of the assignments of error relate to the charge, each defendant assigning the same matters for error. The charge was in writing, part typewritten and part script, and was fastened together and handed to the jury as one document. In the typewritten part, parts of three paragraphs, containing the usual instructions as to the effect of proof of good character, were stricken out by the Trial Judge by marking through them with pen and ink, in the manner shown in the three paragraphs which we have reproduced and numbered from the original charge sent up (see Appendix, p. 12, infra).

Defendants assign error upon the stricken part of the first paragraph. They assert that the Judge erred "in handing the jury the written charge in which an effort was made to mark out the following (quoting the part struck out)"; that since there was no proof of good character of any witness or any defendant in this case, it was error to charge upon that subject; and that the Judge's attempt to mark this out "simply served to challenge the jury's attention to this portion of the charge which was improperly included."

Defendants assign error upon the stricken part of the second paragraph. They say the Judge erred "in handing the jury the written charge in which an effort was made to mark out the following (quoting the part struck out)"; that this was improper because there was no proof as to character; and that the marking out of this statement, but leaving it so it could still be read, "simply had

the effect of challenging the jury's attention to this portion of the charge."

Defendants assign error upon the part struck out of the third paragraph. They urge that the Judge erred "in handing the jury the written charge in which an effort was made to mark out the following (quoting the part marked out)''; that this was improper because there was no proof and no issue as to character; that the marking out of this part, but leaving it so it could still be read, simply challenged the jury's attention to it and created an inference that the defendants had no proof of good character to strengthen the presumption of their innocence, or to be looked to in determining the weight of their testimony.

It is said by learned counsel that all these assignments "go to the proposition that the Trial Judge committed error by striking out, but not obliterating, certain portions of the charge that had no place in the case''; and it is insisted that since the jury could read the parts the Judge had marked out, but not entirely obliterated, they took them as part of the charge or instructions by which they were to be guided; and that this manner of marking up the charge and delivering it to the jury violated our statute (T.C.A. sec. 40-2516), which requires every word of the charge to be in writing and the writing delivered to the jury.

It is true that this statute makes it mandatory in felony cases that every word of the Judge's charge shall be in writing, and no part of it delivered orally, but every word shall be in writing and read by the Judge to the jury, and the writing taken with them upon their retirement. And the necessity of strict observance of this stat-

ute has been stressed in many of our cases. *Black v. State,* 201 Tenn. 15, 296 S.W.2d 833; *Adcock v. State,* 191 Tenn. 687, 689, 236 S.W.2d 88, and cases there cited.

It is also true that the statute requires that, where one is on trial for his life or liberty, the judge must give the jury a charge in writing, prepared for and adapted to, the evidence in that case, and not a mere agglomeration or patchwork of shreds and scraps from a general form or other charges, with erasures, interlineations, or annotations which serve only to confuse and mislead the jury. The giving of such a charge violates this statute, and cannot be tolerated. *Adcock v. State,* supra; *Pedigo v. State,* 191 Tenn. 691, 236 S.W.2d 89.

While the charge in the case before us had these parts marked out as aforesaid, we think it did not infringe this rule. Apparently, the Trial Judge prepared it for this case during the progress of the trial, containing appropriate instructions as to proof of good character, anticipating that defendants would adduce such proof; but at the end of the trial, no such proof having been put on, the Judge struck out these parts of the charge as inapplicable.

We cannot agree with learned counsel that since the jury could read these parts the Judge had marked out, but not obliterated, they would feel they must take them as part of the charge or instructions by which they were to be guided. On the contrary, we think when the jury saw these parts the Judge had struck out, instead of taking them as part of the charge, they naturally understood that, inasmuch as the Judge had struck them out, they were not intended to be, and were not, part of the charge.

We are unable to find a case exactly in point. But we think the most nearly analogous case is *Frady v. State,* 67 Tenn. 349, where the jury, having been out two days, returned into court, said they could not agree, and the judge orally stated to them: ''Some twelve men had to settle the matter; that a verdict should be rendered if they could do so without violating their conscience, and under the oath they had taken.'' They again retired and soon brought in a verdict of guilty.

It was held that this oral statement did not violate the statute, requiring every word of the charge to be in writing, because such statement was not part of the charge. Said the Court: ''These remarks were not a part of the instructions of the court to the jury.'' To the same effect: *McClanahan v. State,* Blount Criminal, opinion this day delivered.

Likewise, we think these parts which the Judge struck out of the charge, even though not completely blotted out and made invisible, were no part of the charge, and that the jury naturally understood they were no part of the charge, or instructions for guidance of the jury; and that no prejudice could have resulted to the rights of defendants.

We think *Adcock v. State,* supra, relied on by defendants, is not in point. There, after asking and obtaining defendant's consent to waive a written charge, the Trial Judge charged the jury orally and *extempore,* then read from a typewritten form charge parts which were applicable, but handed the jury the whole form which they took with them, and which contained matter ''irrelevant and confusing,'' and even stated that defendant admitted the

killing and relied on self-defense, when in fact his defense was an alibi.

Nor do we think *Pedigo v. State,* supra (191 Tenn. 691, 236 S.W.2d 90), is in point. There, the charge, as handed to the jury and taken with them to the jury room, contained "incompetent and irrelevant matter, illegible interlineation and meaningless annotation," so that "the charge might as well have been written in a foreign language"; for it could serve no purpose but to confuse the jury.

For these reasons, all of the assignments of error are overruled, and the judgment of the Circuit Court is affirmed.

## Appendix

1. "There are several modes of assailing or impeaching a witness' credit. One is to show by credible witnesses that they know the general character of the assailed witness, and from that general character would not give him full faith and credit on his oath in a court of justice. The fact that the character of a witness is assailed by credible witnesses casts a reproach upon him; and when the general character of a witness is thus assailed on the one hand and is sustained upon the other hand by credible witnesses, it then becomes a question of fact to be decided by the jury like all other questions of fact, and it is not to be judged alone by the number of witnesses for or against, but by their intelligence and means of information and the other tests as to the credibility of witnesses and the weight to be given to their testimony."

2. "In measuring the credibility of a witness and the weight to be given to his testimony, you look to the proof

~~on the subject of his general character; proof of good character and that a witness is entitled to full faith and credit strengthens the presumption that a witness will speak the truth;~~ and you look to the manner or the demeanor of the witness; the consistency or inconsistency of his statements, their reasonableness or unreasonableness; his intelligence; his means and opportunities for knowing the things about which he testifies; his fairness or want of it; his interest in the suit, his relation to those in interest, his lack of interest; his willingness or motive to speak the truth or swear a falsehood."

3. "When a defendant makes himself a witness in his own behalf his credibility is to be determined by the same rules of law by which you determine the credibility of other witnesses; ~~and where a good character is proved by the defendant it may be looked to for two purposes: 1st a good character before the offense becomes a witness for him, strengthening the presumption of his innocence; and 2nd if it be shown to be good now, it may be looked to in considering what weight should be given to his testimony as a witness.~~"