James A. Yelton

*v.*

State of Tennessee.

365 S.W. 2d 877.

(*Nashville,* December Term, 1962.)

Opinion filed February 7, 1963.

Rehearing Denied April 3, 1963.

Robert L. Dobbs, Clyde Mason, Memphis, for plaintiff in error.

George F. McCanless, Attorney General, Walker T. Tipton, Assistant Attorney General, Nashville, for the State.

Mr. Justice White delivered the opinion of the Court.

James David Cannon and James A. Yelton were indicted on September 29, 1961 for burglary of a grocery store known as Big Star No. 54 located in Memphis, Tennessee. They were convicted of safe burglary and the jury fixed their punishment at not more than seven (7) years in the State Penitentiary. The Trial Judge approved the sentence. Both parties appealed and assigned errors. Thereafter, Cannon dismissed his appeal and we consider the case of Yelton only.

It appears, without dispute, that said grocery store was burglarized on the night of August 21, 1960. The safe was broken into and the sum of $21,000.00, mostly in cash, was removed therefrom.

Tommy Junior Guy was arrested in December, 1960, and questioned about the burglary of said grocery store, along with several other unsolved burglaries which had occurred in Shelby County. He admitted his participation in the burglary of Big Star 54 and implicated Cannon and Yelton. He also admitted participating in other burglaries in Shelby County. His testimony will be related in detail herein.

In September 1961, Yelton was arrested and was questioned by a Captain Hutchinson of the Shelby County Sheriff's office at which time he (Yelton) stated:

"* * * that he was a farmer, a cropduster from Enid, Mississippi; that he owned 206 acres of land that he farmed; that he owned a 1959 Cadillac he described to me as white over blue; that it was equipped with a two-way radio; that he owned and had two walkie-talkie that he used in performance of his duties around the farm; he said he owned a 1952 GMC red and white pickup truck; he stated he owned a 1959 black Ford truck, and he also stated he owned three Model 'A' Fords and an airplane. He stated that he knew Abner Wesson Donaldson from a crap game; he stated that he knew Tommy Junior Guy and Seri, and admitted the gambling. He stated he did not know James David Cannon and never heard of him."

In the affidavit of Yelton filed in support of his motion for a severance he said that "he knows the co-defendant James David Cannon, and that he knows the person by the name of Tommy Junior Guy". He also said in the affidavit that on numerous occasions he had engaged in gambling with Cannon and Guy and said, indirectly, that Guy had lost "abnormal sums of money to your affiant".

He denied that he had ever rented an apartment in the Memphis area. The witness, Mrs. Fauver, testifies that he rented one from her and exhibited a signed rental contract as evidence thereof.

Guy appearing for the State testified that he was a professional safecracker and during the early part of 1960 he lived in Kansas City, Missouri with his family. Yelton, whom Guy had met sometime earlier, called him and asked him to come to Memphis to look at a score in Memphis. He defined a score as being a "type of business with a lot of money, safe or goods".

Upon his arrived in Memphis he was unable to locate Yelton and from there proceeded to Batesville, Mississippi where Yelton lived. There is other evidence of residence in Batesville in the record. After this meeting the two of them returned to Memphis where an apartment was rented by Yelton, but in the name of ''J. R. Bridges''. According to Mrs. Fauver, the resident manager of the 88 unit apartment, Yelton and Guy came to her on the 27th day of June, 1960, to rent an apartment. Mr. Yelton represented himself as being J. R. Bridges; that he was a pilot and the young man with him (Guy) was an airplane mechanic. Yelton in the rental application wrote in script that his name was J. R. Bridges; that there would be two adults occupying the apartment; that his former address was Batesville, Mississippi; that he was self employed and his present address was Mississippi and Arkansas. His occupation was that of pilot; that his nearest relative was C. M. Bridges of Batesville, Mississippi, and then he gave some credit references at Batesville.

He paid Mrs. Fauver the sum of $214.50, $100.00 being a deposit on the furniture to be refunded upon termination of the lease, and $114.50 for rent for a month in advance for the month of July, 1960. A couple of days thereafter Yelton and Guy moved into the apartment. Mrs. Fauver saw Yelton, known to her as Bridges, seven or eight times during the period of three months when he occupied the apartment off and on, but in the latter part of August, 1960 he notified her that he was being transferred and going out of the country to a Latin American Country. Mrs. Fauver in early September located Yelton and advised him that she had a tenant who would take the apartment for the last ten days of the month and, there-

fore, if agreeable, she would let them move in and refund to him the original deposit of $100.00. He gave her an address on Adams Street in Memphis to which the refund could be and was sent.

Yelton came to see Mrs. Fauver to pick up some linens that were left in the apartment by some of his friends who had been living there. At that time he apologized to her for the conduct of these people whom she had asked to move. This time Yelton told Mrs. Fauver "that the reason he was in company with these people was because he was an investigator for an insurance company, and that he was doing some special work on a guy, and he had to do these things in order to come in contact with the people involved in some deal".

On the trial of the case Mrs. Fauver identified Tommy Junior Guy and Yelton, known to her originally as Bridges, but later known as Yelton, as being the two men who originally rented the apartment from her.

The defendants Cannon and Guy lived in the apartment rented by Bridges but they decided to leave and did leave on September 19, 1960, when it was surrendered by Yelton, and moved to an apartment on Raines Road in Whitehaven, Tennessee, at which time Cannon signed the lease and made the necessary deposits and paid the necessary rent.

Guy further testified that he and Yelton traveled around in the city of Memphis looking for places to burglarize. They finally decided upon the Big Star 54 Grocery Store and after making an investigation they found the safe was located near a front window and they procured a tarpaulin to cover it while it was to be opened.

They also acquired tools to be used in the actual burglary of the safe.

On the night of the crime Guy and Cannon entered the grocery store by way of the roof and covered the safe with the tarpaulin. Guy used an acetylene torch to open the safe. During this time Yelton was in his car listening to the radio, and was picking up police calls. Guy also said Yelton had provided them, that is, Cannon and Guy with a two-way radio (Walkie-talkie) which they took inside the building with them. Yelton had a similar radio with him. While Guy and Cannon worked on the safe inside the building Yelton listened to all police calls on his car radio and advised Cannon and Guy of the police activities and any other activity in and around the building.

Upon the completion of the burglarizing of the safe the three participants returned to the apartment on Raines Road and divided the money.

It will be remembered that Captain Hutchinson testified that Yelton admitted the ownership of two walkie-talkie radios and that his car was a white and blue Cadillac automobile equipped with short wave radio equipment.

The witness, Cecil Winters of Lansing, Michigan, testified that one Dan Miller, during the latter part of February, 1961 brought two walkie-talkie radios to his shop for repair. On April 27, 1961 they were picked up by Barbara Barnes, a friend and companion of Cannon, according to the testimony of other witnesses. Pictures of these two radios are in the record and they were identified by Guy as being the same type used by them in the burglary. Guy also said repeatedly that Yelton owned a blue

and white Cadillac and that the same was used in the commission of the crime.

Neither Yelton nor Cannon testified in their own behalf. But from their failure to do so, there should not be drawn any inferences of guilt by the jury or the Trial Court for the reason that every one is presumed innocent until proven guilty beyond a reasonable doubt.

The Judge very properly and correctly charged the jury:—"The defendants are not required to take the stand in their own behalf and their failure to do so cannot be considered for any purpose against them, nor can any inference be drawn from such failure of the defendants to take the stand in their own behalf."

However, on appeal this presumption of innocence is displaced and a presumption of guilt is raised and the burden is placed upon the plaintiff-in-error to show that the evidence preponderates against the verdict and in favor of his innocence. *Anderson v. State,* 207 Tenn. 486, 341 S.W.2d 385, 389, and cases there cited, and *Dupes v. State,* 209 Tenn. 506, 354 S.W.2d 453.

A fair statement of the assignments are that:

(1). The evidence preponderates against the guilt of the accused and in favor of his innocence.

(2). The Court erred in denying Defendant's motion for a severance.

(3). The Court erred in refusing to direct a verdict in favor of the Defendant.

(4). The Court erred in refusing to charge various instructions requested by the Defendant.

We consider first the assignment directed to the Court's refusal to grant a severance to Yelton upon motion duly made.

"The rule in this State is that the trial judge will not be put in error for his failure to grant a severance where the defendant was not prejudiced by the refusal and the trial judge did not abuse this discretion. Stated in another way, this Court will not place the trial court in error where it appears that the rights of the defendant were not prejudiced, the affirmative of which would be an abuse of discretion." *Stallard et al. v. State,* 187 Tenn. 418, 428, 215 S.W.2d 807, 811. *Tomlin v. State,* 207 Tenn. 281, 287, 339 S.W.2d 10 and other cases there cited.

In the case of *Woodruff et al. v. State,* 164 Tenn. 530 at pages 538 and 539, 51 S.W.2d 843 at page 845 the Court said:

"On an appeal in the nature of a writ of error, this court does not directly review the exercise of discretion of the trial judge in overruling these motions. But, the motion for a severance having been made and overruled, the inquiry here is whether the joint trial developed prejudice to one or more of the plaintiffs in error, so that the interests of justice require the setting aside of the verdict and the granting of a new trial." See also *Railroad Co. v. Johnson,* 114 Tenn. 632, 88 S.W. 169.

And then the Court used the following language which has been quoted in numerous cases decided by this Court since that date, to-wit:

"Prejudice to the rights of the plaintiffs in error from the fact that they were jointly tried and convicted could only have resulted if a *bona fide defense had been interposed for them.* Since no evidence tending to refute the charge of guilt was offered by any of them, none of them was embarrassed in his defense by the fact that the others were being jointly tried. It may have been to the interest of each that he be tried alone, but the orders of the court are molded to protect rights, and not merely the interests, of persons accused of crime. The state, as well as the persons accused, is entitled to have its rights protected, and, when several persons are charged jointly with a single crime, we think the state is entitled to have the fact of guilt determined and punishment assessed in a single trial, unless to do so would unfairly prejudice the rights of the defendants." (Emphases supplied.)

■ The case of *Thompson v. State,* 171 Tenn. 156, 171, 101 S.W.2d 467—472 held that the granting of a severance is largely in the discretion of the Trial Judge and his exercise of such discretion will not be reversed "unless it appears that the defendants were clearly prejudiced thereby". A collection of the later cases approving this well established rule may be found in 207 Tenn. at page 287, 339 S.W.2d at page 12.

■ Our view of this record is that the Trial Judge did not abuse his discretion in refusing to grant a separate trial to the plaintiff-in-error and, therefore, this assignment of error is overruled.

■ The plaintiff-in-error claims that the Trial Court committed error in failing to grant special requests in delivering his charge to the jury. The first special re-

quest was:—"The Court instructs you, gentlemen, that the witness, Tommy Junior Guy, was and is an accomplice as a matter of law, and under the law, you cannot convict these defendants on the uncorroborated testimony of the witness, Tommy Junior Guy."

We have read the general charge of the Court and find that it contains the same instruction to the jury omitting the name of the witness Tommy Junior Guy. The Court said:—"The law is that a person who knowingly, voluntarily, and with a common intent with the principal offender, unites in the commission of a crime, is an accomplice." Guy was such a person.

Tommy Junior Guy freely and voluntarily testified that he had a common intent with both of the defendants to burglarize the safe in question and that such intent was carried into operation by all three of them. Of course, Guy was an accomplice and the inescapable conclusion is that every person connected with the trial of this case considered Guy to be an accomplice. It is wholly unnecessary for a Trial Court to spell out or define the character of each witness, and if he were to do so it would most probably be assigned as error that he had invaded the province of the jury. For instance, it was not necessary that the Trial Judge tell the jury that the witness Guy was named Tommy Junior Guy. The jury heard this and, of course, knew what his name was, under the testimony, and likewise they also knew, without being specifically told by the Court, that Guy was an accomplice.

The Court did say:

"If a person knowingly, voluntarily, and with an intent to commit a crime aids another in the commission

of it, he is an accomplice of the other. An accomplice is a competent witness for the State in the case wherein a defendant is charged with Burglary in the Third Degree * * * but the jury should take the testimony of an accomplice with a great deal of caution and scrutinize it with care, and the jury cannot convict a defendant upon the testimony of an accomplice unless there is evidence in the case independent of his testimony corroborating his testimony, which independent evidence tends to show the commission of the offense charged and that the defendant committed the offense.''

The Court also said to the Jury:—''The jury are the judges of whether or not any witness is an accomplice, or whether or not there is any evidence independent of an accomplice's testimony tending to show the commission of a crime and the connection of the defendant therewith, and whether or not such independent evidence, if any, is sufficient, taken together with the testimony of an accomplice, to cause them to believe beyond a reasonable doubt that the accomplice has spoken the truth, and that the defendant is guilty of the offense charged.''

■ Our cases do not hold that the Court is bound to say to the jury that an accomplice is an accomplice.

■ It is next complained that the Court erred in failing to charge the special request No. 2 submitted on behalf of the defendant Yelton to the effect that ''if a witness testifies falsely to a material fact, you may disregard the entire testimony of that witness''.

It would not, in our opinion, have been error for the Trial Judge to have so charged this special request but neither do we think it was error for him to refuse to do

so. We have read the entire charge and we believe that the matter complained about is fully covered in the different methods employed to impeach a witness and the weight to be given the testimony of witnesses. Therefore, this assignment is overruled, as are all other assignments with reference to the charge of the Court to the jury, which we have considered and find to be without merit.

The matter that has given us the greatest concern in this case is the sufficiency of the evidence in corroboration of the testimony of Guy, the admitted accomplice.

He testified very freely and very fully about his participation in this particular burglary and testified fully and positively to the participation of Cannon and Yelton. He says that he received a call from Yelton to come to Memphis, Tennessee. Upon arrival there he was unable to locate Yelton and then went to Yelton's home in Batesville, Mississippi. Knowledge that Yelton lived in Batesville, Mississippi gives some credence to Guy's prior statements about his being in prior communication with Yelton.

After arriving in Batesville and contacting Yelton, the two of them went to Memphis where the apartment was rented by Yelton from Mrs. Fauver under the fictitious name of Bridges. Yelton filled out the application in his own handwriting and gave false information. Yelton also gave false information to Captain Hutchinson upon his arrest. According to Hutchinson, Yelton told him that he had never heard of Cannon. He filed an affidavit to the contrary in support of his motion for a severance. He also told Hutchinson that he had never rented an apartment in Memphis. The contrary was proven to be

true through the testimony of the accomplice, Guy, fully corroborated by Mrs. Fauver.

The accomplice Guy said that a 1959 blue and white Cadillac was used in the burglary. Yelton told Hutchinson that he owned a 1959 blue and white Cadillac. Guy said that a two-way radio or walkie-talkie was used in the burglary. Yelton told Hutchinson that he owned two walkie-talkie radios and that his Cadillac was equipped with a two-way radio. Guy testified that the two-way radio was used to monitor police calls and reports during the burglary.

Two RME walkie-talkie radios of the same type and kind as those owned by Yelton were left for repair in a shop in Lansing, Michigan under the name of Dan Miller, who was in all probability the defendant Cannon. His girl friend, Barbara Barnes or Burns, picked up these radios and signed a receipt for them in April, 1961.

We have a number of cases defining what evidence is necessary for the purpose of corroboration of the testimony of an accomplice in order to support a conviction. In the early case of *Clapp v. State,* 94 Tenn. 186, 30 S.W. 214, the Court said:

> "The degree of evidence which shall be deemed sufficient to corroborate the testimony of the accomplice is for the determination of the jury. The law is complied with if there is some other evidence fairly tending to connect the defendant with the commission of the crime, so that his conviction will not rest entirely upon the evidence of the accomplice."

This general statement was quoted with approval in the case of *Sherrill v. State,* 204 Tenn. 427, 434, 435, 321

S.W.2d 811, 815, and the Court in the Sherrill case said further:

"From a practical standpoint it is not necessary that there should be corroborating evidence concerning every material fact as to which the accomplice testified, and it is not necessary that the whole case shall be proved outside the testimony of the accomplice; for otherwise the accomplice's testimony could never avail anything except as cumulative evidence. The rule of corroboration as applied and used in this State is that there must be some evidence independent of the testimony of the accomplice. The corroborating evidence must connect, or tend to connect the defendant with the commission of the crime charged; and furthermore, the tendency of the corroborative evidence to connect the defendant must be independent of any testimony of the accomplice. The corroborative evidence must of its own force, independently of the accomplice's testimony, tend to connect the defendant with the commission of the crime."

It is our conclusion from reading every word of this entire record very carefully that the proof required to corroborate the testimony of Guy has been sufficiently presented in this case to sustain the conviction of Yelton.

We conclude, therefore, that the evidence preponderates against the innocence of the accused and in favor of his guilt.

The fact that the Court refused to grant a new trial is sufficient answer to the assignment that it erred in refusing to peremptorily instruct the jury to return a verdict for the defendant at the conclusion of all the proof

in the case. However, we say again, as we have said so many times in prior cases, that this Court has never, and does not now, approve the directing of verdicts of acquittal or, of course, conviction in a criminal case.

Thus it is that all the assignments of error are overruled and the Trial Court is affirmed.