STATE of Tennessee, Appellee,

v.

Harvey J. STREET, Appellant.

Court of Criminal Appeals of Tennessee,
at Knoxville.

Jan. 25, 1984.

Permission to Appeal Denied by
Supreme Court April 30, 1984.
Certiorari Granted Oct. 29, 1984.
See 105 S.Ct. 321.

William M. Leech, Jr., Atty. Gen., Wayne E. Uhl, Asst. Atty. Gen., Nashville, David Crockett, Dist. Atty. Gen., Lynn Brown, Asst. Dist. Atty. Gen., Elizabethton, for appellee.

Bill Hampton, Stuart Hampton, Elizabethton, for appellant.

## OPINION

WALKER, Presiding Judge.

The appellant, Harvey G. Street, was convicted of first degree murder and sentenced to life imprisonment. The case is before us on delayed appeal after his earlier direct appeal had been dismissed because of Street's untimely notice of appeal.

The killing in this case occurred in Carter County on the night of August 26, 1981, about three months after Street's 17th birthday. After a hearing in the Carter County Juvenile Court, jurisdiction was transferred to criminal court for Street's trial as an adult.

The Carter County grand jury jointly charged Street and five others with the first degree murder of Ben W. Tester, both premeditated and in the perpetration of a burglary. Street's appointed counsel moved for a change of venue, and it was changed to Unicoi County. The trial court denied Street's motion to suppress evidence of his confession. Street's separate trial on July 19–22, 1982, resulted in his conviction.

On appeal Street presents two issues: (1) The court erred in holding that his confession was voluntary and admitting it into evidence. With this argument he also contends that he was denied the right to counsel; and (2) that he was denied his constitutional right to confront the witnesses against him by the admission into evidence of the out of court statement of Clifford Peele implicating him in the murder. We find that the case must be reversed on the second issue.

On August 27, 1981, Ben Tester was found dead, gagged and hanging by the neck from a tree in his yard in Hampton, Tennessee. A window screen had been cut, and the victim's home forcibly broken and entered. The house had been ransacked and there appeared to have been a struggle between the victim and his assailants. Buttons from a shirt the victim had been wearing were scattered throughout the living room of the house, and the telephone wire had been cut. The victim's wallet was also found in the house, containing no money.

The defendant, who lived near the victim, and a number of others were questioned by officers in the three weeks after the murder to find if they had any information about the killing.

On September 17, 1981, the defendant called the sheriff from his grandmother's home to say that he wanted to make a statement. The sheriff sent a car for him and he made the statement in question. The sheriff showed him the statement of Clifford Peele that implicated the defendant in the murder.

In the defendant's detailed and lengthy statement given that night, he said that Peele had asked him about a good house to break in; that he had told Peele of Ben Tester's home because Tester had money and went to church and would be away from home. Peele, Eddie Montgomery, Jeff Causby and the defendant went to Tester's home in a stolen truck, broke in and ransacked the house. Tester, age 73, surprised them by returning before the burglary was complete. Peele threw him to the floor and took his wallet.

By the statement, the defendant said a number of times, "Cliff, let's go," but Peele said that they were going to "string him up." Peele got a rope and Montgomery agreed on the hanging. Because Mont-

gomery threatened to whip him, the defendant tore a sheet; made a gag and put it in Tester's mouth. Montgomery tied the knot in the gag. Peele and Montgomery took Tester out and put him on a truck. Montgomery climbed an apple tree and put a rope over a limb; Peele tied the rope around Tester's neck. At this point Causby ran. Peele and Montgomery eased Tester off the tailgate, leaving him swinging from the tree. Peele, Montgomery and the defendant left in the truck.

Defendant recanted this confession the next day. A suppression hearing was conducted prior to trial in which the court found that the confession by defendant had been freely and voluntarily given. This confession was subsequently admitted into evidence at trial.

Defendant first contends that this statement given by him was rendered invalid by the circumstances surrounding its taking, and in a related argument he claims he was denied the right to counsel during rendition of the statement.

Testimony given at the suppression hearing indicated that the September 17th interrogation of defendant began at 9:27 p.m. and ended at approximately 1:30 a.m. Agents Don Collins and S.A. Sloan of the T.B.I. were present, as were Assistant Attorney General Lynn Brown and Sheriff George Papantoniou. As well, Juvenile Judge Jesse Ray arrived after defendant had given the statement, as it was being read by Agent Collins.

Prior to the interrogation, defendant's father signed a parental interrogation interview waiver that allowed the officers to talk to the juvenile defendant in his presence. He also signed the confession as a witness. Defendant claimed his father left after signing the waiver, although Collins, Brown and Papantoniou stated that defendant's father remained throughout the interrogation. We note that the father, M.B. Street, was not called at this hearing or at trial to support the allegations made by his son.

Defendant also signed a form waiving his *Miranda* rights prior to initiation of the interrogation, as well as signing the completed statement and acknowledging that it was true. He made a number of corrections in the statement before signing.

There is no question that defendant was distraught and cried at times during the interrogation. He also claims that the officers refused to allow his mother to attend the interrogation, although testimony indicated he actually requested that his mother not be there.

Assistant Attorney General Brown stated that he told defendant at least three times he was free to leave during the interrogation; Collins' testimony supported this. Defendant claimed that he asked to go home, but was told he could not until the statement was complete.

Defendant alleged that Sheriff Papantoniou had threatened to send him to jail the next morning if he refused to give a statement concerning the Tester murder. (Defendant had been convicted in juvenile court previously on an unrelated charge and was out on bail pending sentencing.) He said the sheriff also promised to make him a trusty at the county jail if he did confess. The sheriff denied these allegations; these denials were supported by Brown and Collins.

Defendant stated he was promised he could go home after the statement if he did confess and at least temporarily would not be arrested for the murder. The sheriff said he only promised to talk to the judge and Attorney General Brown about this. However, Brown testified that following the statement defendant was allowed to go home and was not arrested for the murder until some four to five days after that. Brown stated this was done because the defendant was already out on bond, there was little risk that he would leave the state, and they feared for his safety. The sheriff also said that he did not want to arrest anyone at that time for fear others would leave the state.

Defendant also claims to have been threatened with the electric chair upon conviction. All the other witnesses, however,

stated that he was merely informed of the seriousness of the crime, although "death penalty" or "electric chair" may have been mentioned.

Defendant claimed the sheriff kept interrupting him during the interrogation, telling him he was lying. He said the sheriff at these times kept referring to the confession of Clifford Peele. Although the sheriff denied these allegations, Brown and Collins testified that the sheriff did interrupt, and that copies of the Peele confession were present during the interrogation.

Finally, defendant claims he requested that counsel be present, but was told by the sheriff that a lawyer would do him no good. This charge was denied by Papantoniou, Collins and Brown; Brown, in addition, remembered defendant specifically stating he did not want an attorney present. The defendant had signed a waiver of rights form that included a waiver of the presence of an attorney.

The court found after hearing the evidence that the confession was knowingly, voluntarily and intelligently given, and overruled the motion to suppress.

■ The voluntariness of a confession is to be determined from the totality of the circumstances surrounding the statement, considering the demeanor and credibility of the witnesses. *State v. Kelly,* 603 S.W.2d 726 (Tenn.1980). Examining the suppression hearing record in this light, there is material evidence to support the finding of voluntariness by the trial judge. This finding has the weight of a jury verdict, and as such, this court is bound to accept that determination. *State v. Adams,* 631 S.W.2d 392 (Tenn.1982); *State v. Kelly,* supra, at 729.

■ This same "totality of the circumstances" approach is used to determine if there has been an effective waiver of counsel. *Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). The written waiver of right to counsel, supported by General Brown's testimony that defendant stated he did not want counsel present, are sufficient to support the im-

plicit finding of effective waiver of counsel. These two issues on the admissibility of the confession are without merit.

Defendant next contends that introduction of Clifford Peele's confession implicating him in the homicide without Peele's presence at trial violated defendant's right to confront the witnesses against him.

At trial, defendant relied on an alibi defense. Testifying in his own behalf, he denied the validity of his September 17th confession, saying that Sheriff Papantoniou read Clifford Peele's confession to him a number of times and told him to "say the same thing similar to this." Defendant claimed that whenever he made a statement differing from Peele's confession the sheriff would tell him he was lying and then would "read Peele's statement back and I'd say yeah that's right."

The state called Sheriff Papantoniou as a witness during rebuttal testimony in an attempt to introduce a written copy of the Peele confession, as well as have him orally recite the confession to the jury. The state's position was and is that the confession was not introduced to prove the truth of matters asserted therein. Rather, the confession was used to rebut defendant's allegation that his statement was derived from Peele's. This was done by pointing out specific references to the scene of the crime in defendant's statement that were absent in Peele's. Since the confession was being used for this nonhearsay purpose, the state argues that there was no confrontation problem. No attempt was made by the state to call Peele as a witness, nor to redact portions of the Peele confession implicating defendant in the homicide. Peele was in the Unicoi County Jail near the courthouse. The trial judge after some deliberation admitted the confession into evidence over defendant's objection. He cautioned the jury to consider the confession for rebuttal purposes only and reiterated this caution during the jury charge.

We agree with the state that the Peele confession as used at trial was not hearsay within traditional rules of evidence. See

Paine, *Tennessee Law of Evidence*, § 47 (1974). However, defendant's confrontation rights are not foreclosed merely because the confession as admitted did not constitute hearsay. While hearsay rules and the Confrontation Clause are generally designed to protect similar values, the overlap between the two is not complete. *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *State v. Jones*, 598 S.W.2d 209 (Tenn.1980).

■ In this case, while admission of the confession was not technically used to prove its truth, the state in actuality placed before the jury testimony incriminating the defendant, made by one not available for cross-examination.

In *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), the petitioner's accomplice, Loyd, had previously been convicted. The prosecution called him as a witness at petitioner's trial, where he invoked his privilege against self-incrimination. The prosecution then produced a confession signed by Loyd, and under the guise of refreshing his collection, read aloud this confession implicating the petitioner. Every few sentences he would ask if these statements were true and Loyd would reassert his privilege. Afterwards, law enforcement officers were called to the stand and verified that the document read from was indeed Loyd's confession. This document was never formally offered into evidence. The Supreme Court reversed petitioner's conviction based on a violation of his right to confrontation. They noted that while the prosecutor's reading of the alleged confession was not technically hearsay, it "may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance upon the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was true."

■ Here, the alleged confessor was not even called to the stand. Those statements inculpating the defendant stood basically unchallenged as the state directed inquiry not to those allegations but to the factual statements surrounding the scene of the crime. The implication was left that the confession was a true rendition of events on the night of the homicide. This situation was compounded by introducing into evidence a written copy of the confession without any attempt to remove references directly linking defendant to the homicide. There can be no doubt that admission of this confession for any purpose constitutes a denial of defendant's fundamental right to cross-examine those witnesses against him. In Tennessee, cross-examination is not limited to the subject matter dealt with directly, but extends to any matters material to the lawsuit. See *Long v. State*, 607 S.W.2d 482 (Tenn.Cr.App.1980). Had Peele been present, defendant could have challenged his accusations as well as the authenticity of the confession. He was not given this opportunity.

■ This court recognizes that the right to confront and cross-examine witnesses against one is not absolute, and may in certain cases bow to other legitimate interests in the criminal trial process. However, whenever this occurs it calls into question the "ultimate integrity of the fact-finding process and requires that the competing interest be closely examined." *Berger v. California*, 393 U.S. 314, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969); *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

A close examination of the circumstances surrounding admission of this confession into evidence without calling the confessor to the stand reveals no valid state interest that is served. Although Peele was in jail awaiting trial when the confession was introduced, the state made no effort to call him to testify. Nor was an effort made to limit prejudice to the defendant by redacting incriminating portions of the confession. From an examination of the confession, this could have been done without detracting from the alleged purpose for which the confession was introduced. One cannot help but conclude that introduction of this unedited confession was merely a transparent attempt to condemn defendant

from another source without allowing the veracity of the source or the confession to be tested by cross-examination.

In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), petitioner Bruton and his co-defendant Evans were convicted after a joint trial. Although neither defendant testified, an oral confession made by Evans implicating Bruton was introduced at trial. The trial court cautioned the jurors that Evans' confession should be disregarded in determining the guilt or innocence of Bruton. The Supreme Court reversed Bruton's conviction, holding that at a joint trial where neither defendant testifies, admission of one codefendant's confession inculpating the other violates his right to cross-examination secured by the Confrontation Clause. The court determined that this was true notwithstanding the cautioning instructions given by the trial judge.

The state places great reliance on the "Interlocking Confessions Doctrine" set forth in *Parker v. Randolph*, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979). This doctrine is purported to create an exception to the *Bruton* rule. In *Parker* four members of the court held that the introduction of a codefendant's confession at a joint trial where he does not testify will seldom, if ever, violate the Confrontation Clause if the defendant himself has confessed to participation in the crime. A fifth member of the court, creating a majority, reasoned that any *Bruton* error caused by introduction of this interlocking confession was harmless beyond a reasonable doubt. See also *State v. Elliott*, 524 S.W.2d 473 (Tenn. 1975).

We first note that a common thread running through cases involving nontestifying codefendant confessions and resulting confrontation problems is their use at joint trials. In these trials, policy arguments favoring judicial economy and efficiency allow admission against the confessor. However, these same policy arguments favor limiting instructions by the trial judge and redaction if possible, to avoid prejudice to the other defendant. This court can find

no case that has allowed introduction of one codefendant's confession at a severed trial against the other defendant without calling that available confessor to testify.

■ In Tennessee when *jointly* tried codefendants have confessed and their confessions are similar in material aspects, the *Bruton* rule does not apply. *State v. Elliott*, supra, p. 477, 478. The implication is that for the "Interlocking Confessions Doctrine" to apply there must be a *joint* trial. However, assuming that this doctrine were applicable to severed trials, if:

"(T)he confession of one non-testifying codefendant contradicts, repudiates, or adds to material statements in the confession of the other non-testifying codefendant, so as to expose the latter to an increased risk of conviction or to an increase in the degree of the offense with correspondingly greater punishment, the latter codefendant is entitled to test the veracity of the statements in the confession of his codefendant. A denial to him of his right through the failure of his codefendant to take the stand brings the *Bruton* rule into play." *State v. Elliott*, supra, at 478.

■ In the present case, Peele's confession made the defendant much more a principal actor in the burglary and hanging than the defendant's September 17th confession did. In his confession the defendant said that he kept telling Peele to leave after they had robbed Tester but that Peele insisted on the hanging; that defendant did not actually participate in the hanging. Peele's confession said that both he and the defendant placed the rope around Tester's neck. Where each confessor endeavors to place responsibility for the homicide on the other defendant, then the confessions do not interlock. *State v. Robinson*, 622 S.W.2d 62 (Tenn.Cr.App.1980).

■ Likewise, the trial judge's caution to the jury not to consider Peele's statement as proof of defendant's guilt was ineffective to correct denial of defendant's right of confrontation. This is especially true when the confession directly charges

defendant with the murder, describing his role in the killing in great detail. See *Stallard v. State*, 187 Tenn. 418, 215 S.W.2d 807 (1948). In the context of this case, we feel that "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury cannot be ignored." *Bruton v. United States*, supra, 391 U.S. at 135, 88 S.Ct. at 1627, 20 L.Ed.2d at 485.

■ Of course, where proof of defendant's guilt is overwhelming and it appears beyond a reasonable doubt that the confrontation violation had no effect on the verdict, we recognize the error may be considered harmless. *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *State v. Elliott*, supra, at 478; *Alexander v. State*, 562 S.W.2d 207 (Tenn.Cr. App.1977). After careful study, we are unable to say that this is true in the case before us. Peele's statement not only implicated the defendant, it alone could establish all essential elements of the homicide, had the jury chosen to believe defendant's confessions were in fact involuntary. Defendant is entitled to a new trial free of this constitutional error.

Reversed and remanded.

DUNCAN and SCOTT, JJ., concur.