IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 19, 2016

**TRINIDAD MARTINEZ FLORES v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2010-C-2341     Seth Norman, Judge**

_____

**No. M2015-01504-CCA-R3-PC – Filed June 29, 2016**

_____

In 2011, a Davidson County jury convicted the Petitioner, Trinidad Martinez Flores, of multiple offenses involving the possession and sale of more than 300 pounds of marijuana. The trial court sentenced the Petitioner to fifty-six years of incarceration. This Court affirmed the Petitioner's convictions and sentence on appeal. *State v. Trinidad Martinez Flores*, No. M2012-00285-CCA-R3-CD, 2013 WL 3497644, at *1 (Tenn. Crim. App., at Nashville, July 11, 2011), *perm. app. denied* (Tenn. Nov. 13, 2013). The Petitioner filed a petition for post-conviction relief alleging that his trial counsel represented him ineffectively. After a hearing, the post-conviction court denied the petition. On appeal, the Petitioner contends his trial counsel failed to adequately represent him, noting that the Board of Professional Responsibility subsequently disbarred trial counsel for fraudulently billing the state. On appeal, we conclude that, considering the weight of the evidence, counsel's representation did not prejudice the Petitioner. As such, the Petitioner is not entitled to relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

George W. Waggoner, III, Mt. Juliet, Tennessee, for the appellant, Trinidad Martinez Flores.

Herbert H. Slatery III, Attorney General and Reporter; Meredith Devault, Senior Counsel; Glenn R. Funk, District Attorney General; and Dan H. Hamm, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Trial**

This Court summarized the facts supporting the Petitioner's convictions as follows:

> In February of 2010 the Drug Enforcement Administration (DEA) in El Paso, Texas developed a truck driver as a confidential source (CS). Over the course of several interviews, the CS admitted that he was involved in the distribution or transportation of narcotics, cocaine, and marijuana to various cities and states across the United States. The CS further indicated that he was involved in "picking up the proceeds derived from the sales of these narcotics from various locations and taking it back to Texas, to El Paso, which was smuggled back into Mexico or into Mexico to the drug trafficking organization." The CS also stated that he had delivered approximately 1,000 pounds of marijuana to Tennessee and that he drove to Nashville "at the end of January or the 1st of February, he couldn't recall at that time, and picked up approximately $200,000 and taken it back to Mexico or to Texas where it was smuggled back into Mexico." The CS contacted the DEA again in February of 2010 and said that he had been recruited to drive to Nashville and pick up an additional $200,000 from an individual named "Trini," who was later identified as [the Petitioner]. [The Petitioner] was the individual in charge of the money in Nashville.
>
> On March 2, 2010, the CS met with Special Agent Dennis Mabry of the Tennessee Bureau of Investigation (TBI), who was assigned to the DEA, and another agent. A series of recorded phone calls were placed to [the Petitioner], and arrangements were made for the CS to meet with [the Petitioner] or a representative to pick up the $200,000. Special Agent Mabry explained that [the Petitioner's] telephone number had been given to the CS through the "drug trafficking organization in Mexico." The recorded calls were in Spanish and were monitored by Special Agent Mabry and another agent. The other agent translated the calls as they came in. A meeting took place at the Truck Stops of America located off of Exit 62 on Interstate 24 at Old Hickory Boulevard in Davidson County. Special Agent Mabry testified:
>
> > Once we decided to have the meeting location, the CS went to that location under our control, a surveillance team was in the area. Over the next several hours there were several phone calls between the individual known as Trini [the Petitioner] and the confidential source, or truck driver, debating whether it should be done that day or the next day.

2

At approximately 9:30, [the Petitioner] had contacted the tractor trailer driver and said that he was going to send a female in his place and she would be driving a Nissan Altima, gray. From that point, a few minutes later, we observed a female driving a gray Nissan Altima that pulled up next to the tractor trailer driver. The tractor trailer driver exited his vehicle and went over to the passenger side of the Nissan Altima and retrieved a boot box, just a big box that you use when you buy boots, which we later determined contained U.S. currency. From that point, the Nissan Altima departed the area and was followed by a surveillance team back to 4612 Arapaho Court here in Davidson County.

* * *

From that point the CS was followed to a secure location and we, we being the police, took possession of the boot box containing the U.S. currency, we placed it in an evidence envelope, and the CS was allowed to return to Texas.

Special Agent Mabry testified that the box contained approximately $200,000 which was then forwarded to El Paso, Texas, "in [cooperation] with the DEA in El Paso, which then gave the money back to the [CS] under controlled conditions, and then we delivered it to the organization — to a representative of the organization so the money was eventually smuggled back into Mexico or in Mexico." Special Agent Mabry testified that the money was allowed to be smuggled back into Mexico in order to "keep the investigation alive so we could target this organization or conduct an investigation because they were a major narcotics distributor in this area." He said that the head of the drug organization lived in Cancun, Mexico.

Special Agent Mabry testified that on March 10, 2010, he requested a warrant for a wire tap order from Judge Seth Norman for [the Petitioner's] telephone number that had been supplied by the CS. The request was granted. Agent Mabry testified that on March 12, 2010, there was a series of "court authorized intercepts that occurred in which someone — the head of the organization contacted the individual known as 'Trini.'" He and other agents conducted surveillance in the area of Interstate 24, Exit 62, and another truck driver arrived at the truck stop and met with the same woman

as seen in the earlier transaction with the CS on March 1, 2010. However, the woman was driving a Ford Excursion rather than the Nissan Altima. Special Agent Mabry testified that the Ford Excursion had been seen earlier at the Arapaho Address. When asked if the truck driver was stopped, Special Agent Mabry testified: "We felt at that time it was too early in the investigation. We knew if we stopped the vehicle, seized the money or arrested the individual, that the telephones would basically be dropped, and we would have to start from scratch or end it." Special Agent Mabry testified that the driver of the Ford Excursion returned to the address at 4612 Arapaho Court in Antioch.

Special Agent Mabry testified that while listening to wiretaps on March 23, 2010, a call was intercepted in which an individual previously known only as "Trini" [the Petitioner] contacted the Mexican Consulate in Atlanta, Georgia. When the Consulate asked for his full name, the caller replied: "Angel Gabriel Flores Perez." The following day during another call, the same person gave his address as 4612 Arapaho Court. Special Agent Mabry testified that at some point during the drug investigation, he learned that the "source of supply in Mexico" had called [the Petitioner] and told him to "get rid of his telephone" due to a drug seizure by the DEA in Chicago. Special Agent Mabry testified that Defendant had a total of three different phones over the course of the investigation for which Special Agent Mabry obtained wiretaps. He explained that individuals in the drug organization would use "Nextel Boost or boost phones. They are just basically disposable phones, they have the Nextel capability or push-to-talk capabilities." Special Agent Mabry further testified that rather than changing their phone numbers, the individuals would "get rid of the entire phone and buy a new phone because they are so cheap and disposable."

Special Agent Mabry testified that in the month of April, he learned through intercepted calls that a tractor-trailer containing approximately 1,500 pounds of marijuana was coming to the Nashville area. He said that an individual flew into Nashville, and they began surveillance on the individual the same morning. However, the individual learned that police were following him, and police backed away hoping to save the investigation. The load of 1,500 pounds of marijuana was diverted to Dickson County, where it was seized by a local drug unit with the assistance of another confidential informant other than the CS originally involved in the case sub judice.

4

In May of 2010, another wiretap was initiated, and on May 5, 2010, a call related to another load of narcotics was intercepted. Special Agent Mabry testified that through court authorized intercepts, it was determined that the drug organization was trying to orchestrate a load coming to Nashville, and they were looking for a new location or a new warehouse facility to use. Special Agent Mabry said:

> There was an individual that later we discovered or identified as Bobby Hunter, who was supposed to get this load of narcotics that was coming to middle Tennessee. The head of — the source of supply, or head of the organization in Mexico, contacted [the Petitioner] and wanted [the Petitioner] to look at this warehouse facility located over off of McNally, to see if he was — they would be happy with that warehouse.

> Once they got to that location, we intercepted — we had a court authorized intercepted call in which [the Petitioner] contacted the source of supply in Mexico and said that he was happy with the warehouse facility, and he gave some explanation and talked about it, but he mentioned that they had run off into a ditch, and as soon as the tow truck driver got there and got them out of the ditch, they would be able to move locations and go somewhere and look at something else.

> From that point, — I was able to hear the court authorized intercepted call so I go to that location and see a white Escalade that had run off the road into a ditch at the 431 Atlas Drive address. I saw [the Petitioner] at that location in the passenger's seat, and I saw an individual later identified as Bobby Hunter driving the vehicle. The registration returns to Mr. Hunter. From that point, we were able to determine that, basically, the next tractor trailer load was going to come to that location.

Special Agent Mabry testified that calls continued to be intercepted from May 5 until May 28, 2010. He learned that [the Petitioner] was "directing individuals to transfer or wire transfer money from locations, various places across Nashville to Mexico and to the Cancun area, where the source of the supply was." Although he could not identify all of the individuals who helped [the Petitioner], he identified [the Petitioner's] ex-

5

wife or girlfriend, co-defendant Gabriela Perez, and co-defendant Gerardo Torres as wiring money to Mexico. Special Agent Mabry testified that Ms. Perez lived at 111 Old Hickory Boulevard off of Interstate 40 in Bellevue.

Special Agent Mabry testified that on the morning of May 28, 2010, co-defendant Bobby Hunter was observed through surveillance "up and moving." Someone from co-defendant Hunter's residence went to "a local area" and rented a U–Haul truck that was taken back to the residence. Co-defendant Hunter then "did some running around to different locations" so agents felt that a load of marijuana would be coming into the area. Special Agent Mabry testified that the U–Haul truck eventually left the residence and went to the warehouse at 431 Atlas Street. Special Agent Mabry drove to Atlas Street and observed a man later identified as co-defendant Phillip Smith with the U–Haul truck. He then left Atlas Street and attempted to locate co-defendant Hunter. Special Agent Mabry said: "I came out at McNally, which hooks up to Atlas, and turned right on Nolensville Road and traveled south. I observed — I saw Mr. Hunter, and he appeared to be escorting a tractor trailer." He said that co-defendant Hunter was driving a Cadillac Escalade that he had previously been seen driving, that was registered to him, and it appeared that co-defendant Hunter was leading the way to Atlas Street with a tractor-trailer following. There appeared to be only one person in the tractor-trailer. Special Agent Mabry testified that when he saw the tractor-trailer, it was within 1,000 feet of Croft Middle School.

Special Agent Mabry notified the surveillance team of his observations, and he turned around and began following co-defendant Hunter and the tractor-trailer. He said that there was only one person in the tractor-trailer. Special Agent Mabry testified that prior to seeing the tractor-trailer on May 28, 2010:

> In one of the court authorized intercepts, when [the Petitioner] was in contact with the Mexican telephone or source of supply in Mexico, the source of supply informed [the Petitioner] that he needed to deposit money into a Bank of America account, and he gave him the name of Baez, Mr. Lazaro Baez. So [the Petitioner] was supposed to deposit that money into Mr. Baez's account.

Special Agent Mabry testified that co-defendant Hunter and the tractor-trailer driver drove to 431 Atlas Street, and he drove to a nearby

6

warehouse facility upon a hill in order to observe the area. Other surveillance units were also in the area. Special Agent Mabry testified that the tractor-trailer backed up next to the door of the warehouse, and a garage door was opened. The U–Haul was also backed up so that the trucks were "back to back." Special Agent Mabry observed individuals "walking around the truck and begin throwing items from the tractor trailer into the U–Haul, [in] bundles or bales." He said:

> Then at that point, we decided that — we knew based off court authorized intercepts that marijuana was coming here, we knew they were using that location, and we knew that that was the marijuana. We moved in, and conducted an arrest or takedown.
>
> * * *
>
> When I pulled up to conduct the arrest or takedown situation, I arrested an individual named Trujillo Duarte. I took him into custody. He was standing beside—on the west — if I'm facing the U–Haul truck, he was facing the left side.
>
> As we pulled up, he knew that the police had arrived. He reached up and tried to pull down the door, the overhead door to the U–Haul trailer, but I placed him into custody. I went back to the right, and I saw three individuals that were in the tractor trailer itself, the trailer portion of the tractor itself. One of those individuals was Bobby Hunter, another one was identified as Phillip Smith on that date, and Mr. Baez was also in that trailer.

Special Agent Mabry testified that after everyone was taken into custody at Atlas Drive, he and others proceeded to co-defendant Hunter's residence near Nolensville Road to conduct a search. At the residence, agents found a handgun, large digital scales commonly used to weigh marijuana for distribution, and bundles of rubber bands, which were commonly used to bundle U.S. currency to send back to drug dealers. According to information from the investigation, co-defendant Hunter was to receive the shipment of marijuana.

After searching co-defendant Hunter's residence, Special Agent Mabry testified that he and other agents proceeded to co-defendant Gabriela

Perez's apartment at 111 Old Hickory Boulevard. Special Agent Mabry testified that she was involved in the distribution of money or wire transfers for [the Petitioner's] group. Numerous copies of wire transfers and "a little bit under $10,000" were found at co-defendant Perez's apartment. Co-defendant Perez indicated that the currency did not belong to her. Based on intercepted calls, Special Agent Mabry testified that [the Petitioner] did not keep all of the money with him because he would contact co-defendant Perez and tell her to wire certain amounts of money. A table of calls was prepared that corresponded with those wire transfers which were the basis for Counts six through sixteen of the indictment. Special Agent Mabry reviewed each wire transfer receipt and call from the table where [the Petitioner] was either instructed to make the wire transfer or where he contacted co-defendant Perez to direct the transfer.

Through intercepted calls, Special Agent Mabry learned that [the Petitioner] had found out about the "takedown" and moved from his address at 4612 Arapaho Court to a residence in Springfield located at 4502 Roy Cole Drive. The decision was then made to take [the Petitioner] into custody. Special Agent Mabry testified that a search warrant was executed on July 1, 2010, at the Springfield residence, and [the Petitioner] and co-defendant Gerardo Torres were arrested. During the search of [the Petitioner's] residence, additional wire transfer receipts were found for transfers made to locations in Mexico. Special Agent Mabry testified concerning the receipts and corresponding phone calls. A vehicle registered to co-defendant Perez was also found at the residence. Special Agent Mabry testified that a document was seized during the search containing a "telephone number, or an account number, that has got Gabriela Perez on it and the amount, 6,145." He explained that a FedEx shipping bill was found at the residence with Gabriel Flores as the recipient. It was believed that [the Petitioner] also went by that name, and the bill listed the address of 4612 Arapaho Court. Special Agent Mabry testified that the shipping bill was consistent with a telephone call that was intercepted on March 24, 2010, concerning shipment of a hat. He said some documents were also found bearing the name of co-defendant Lazaro Baez with some amounts written on them, and there was also what appeared to be a "tally sheet or a bookkeeping idea commonly used by narcotics dealers to keep up with narcotics going out and money coming in." [The Petitioner] later admitted that he was involved in a drug trafficking organization and that he was the "money side" of the organization.

Special Agent Mabry testified that he intercepted "at least 1,000" calls over the course of the investigation. A portion of the calls were selected to illustrate Special Agent Mabry's testimony, and two transcripts of the calls were admitted into evidence. Special Agent Mabry testified as follows concerning those calls.

Calls from May 1, 2010
Call # 119, 12: 47 p.m. Central Time
An unknown female answered the phone, and [the Petitioner] asked for Don Pachin. The female then replied, "Oh, we are carrying some boxes in Shelbyville [.]" [The Petitioner] said that his "son's mother" was waiting for [Mr. Pachin] in Nashville with one box." The female replied, "Yes, we are going to carry this, and then we are going to go there." [The Petitioner] then told the woman to call when they were "at the 199" where they could meet. [The Petitioner] also gave the woman a phone number of "615-578-7384" and the name "Gabriela." The woman then asked if "he" was supposed to call "Gabriela" when they were "at 199," and [the Petitioner] replied, "Yes." Concerning the call, Special Agent Mabry testified:

> I felt like based off of my training, knowledge, experience through this investigation that there is money going to be exchanged. They are talking about a box, and money was going to be given to Gabriela. They were going to Exit 199, off Interstate 40, and meet when they got there.

He said that Exit 199 off of Interstate 40 was very close to Gabriela Perez's residence.

Call # 130, 3:35 p.m. Central Time
An individual named "Pachin" called [the Petitioner] and asked, "Is the box very large?" [The Petitioner] responded, "No, it is just a little box." Pachin then said, "Ah, good let's talk — let me talk to — tell him/her to call me." [The Petitioner] indicated that he would have "him/her" call "Pachin."

Call # 131, 3: 36 p.m. Central Time
[The Petitioner] called co-defendant Perez and told her to call "Pachin." Co-defendant Perez replied, "Oh, but I am going to see him in the Marco [sic] in the gas, leaving the 199." [The Petitioner] then told co-defendant Perez to "[t]ell him that it is small." Co-defendant Perez also said, "Hey, it's ready, it has arrived." She then agreed to call "Pachin." Regarding the call, Special Agent Mabry testified that co-defendant Perez was supposed

to meet "Pachin" at the Mapco gas station at Exit 199. Special Agent Mabry also testified that no arrests were made at the time of the money transfer because they thought it was a small amount of money being transferred on May 1, 2010, and they "didn't want to blow the whole investigation over a small amount of money."

Calls from May 5, 2010
Call # 626, 11:20 a.m. Central Time
[The Petitioner] called "Chicaharo," who was identified as "the head of the organization, the source of supply in Mexico." [The Petitioner] indicated that he saw "Temo" who gave him "Four pesos." "Chicaharo" then instructed [the Petitioner] as to the following, ". . . Leave Bobby's [co-defendant Hunter's] radio so they can take it to the land, and he is going to take you to a warehouse that he rented so you can tell me if it is good or not." In interpreting the call, Special Agent Mabry testified:

> Basically, this is when Mr. Hunter locates the warehouse at 431 Atlas, and the head of the organization wants [the Petitioner] to go out and do an inspection to make sure everything is cool here and get his approval so they can make a shipment of marijuana to Nashville.

Call # 677, 2: 00 p.m. Central Time
Special Agent Mabry testified that [the Petitioner] called "Chicharo" concerning the warehouse and said: "I was just with this guy 'Bush.'" Hey I am here with the white guy, the white guy, no, the place is great. It is awesome, it is really —. . . B–I–T–C–H–I–N–G here. It is like 6,000 by 6,000 feet. That is how big it is, . . ." Special Agent Mabry testified that the following exchange then took place:

> Chicharo laughs and says, The place is good then?
>
> And [the Petitioner] replies, Yes, it is awesome, awesome, it is rentable. It is [unintelligible] but they are going to be late with the part with the wood I say, because sometimes it has all of the tools and it has I don't know what I say, [unintelligible]. Later in the afternoon the dude is coming to do the contract for the warehouse.
>
> Chicharo replies with, Perfect.

10

[The Petitioner] replies with, Hey what about the land, you said you wanted like 250,000 bars for it right?

Chicharo replies, I told him to pay the 50,[ ], because we owe him 100 balls from a job that we had like five years ago.

[The Petitioner] replies with, Ah, okay, that's okay. So he was telling me that we are going to, [ ], here, if here they do the check or do they send cash. I have to investigate that and it seems to me as if it were a doctor's right?

Chicharo replies, Let me talk to the Chilango. Let me invite him to work and when he — Let me talk to Chilango and when he arrives and for the next week, [], next week and I will grab it.

[The Petitioner] replies, oh yes, I'm going to take him so he can look at it, [], he said yes, and that you said it was 250,000 balls, we can have it appraised, but if it is like that by the Galatin, [sic], and the Old Hickory then it is worth some money, like 150[-]200 balls.

Chicharo replies, okay.

[The Petitioner] re[p]lies, Yes I will take here as soon as the tow truck arrives to take it out.

Chicharo replies, All right then.

Special Agent Mabry testified that at the time of the call, [the Petitioner] was in a vehicle with co-defendant Hunter that had run off the road at the entry of 431 Atlas Drive. Special Agent Mabry interpreted part of the conversation that referred to owing someone "100 balls from a job" as indicating that it was a drug debt from a prior transaction. He said, "It is coded language. It is common among narcotic traffickers to use coded language when on the telephone."

Call # 689, 3:38 Central Time
[The Petitioner] asked Chicharo how long they will "need where they are going to put the wood" or the "material for the warehouse." Chicharo then indicated that it would be there for three or four hours, and they were going

11

to rent the warehouse for three months. He further said that he would need the warehouse for the following Monday.

In interpreting the call, Special Agent Mabry testified:

> They are basically talking about how long they are going to need it, they are going to rent it for three months, the materials, meaning the narcotics, that are coming to town. He says no, but he wants to — Chicharo wants to speak with someone else in the organization before that, but he needs it for Monday.

Call # 690, 3:39 Central Time
[The Petitioner] told Chicharo that "that guy will try to do the contract this afternoon." However, Chicharo said that he needed to "talk to the Chilango first."

Calls from May 8, 2010
Call # 899, 1:55 p.m. Central Time
[The Petitioner's] juvenile son answered the phone, and co-defendant Perez said, "Son, ask your dad if I am supposed to send Mingo's to Cancun as well." [The Petitioner's] son replied, "Both of them to Cancun." Co-defendant Perez then indicated that she was looking for a Western Union "because all of them were down[.]" Special Agent Mabry testified that the call referenced wire transfers to Cancun, Mexico.

Call # 916, 537 p.m. Central Time
[The Petitioner] received a call from "Mingo" and said that he needed to give Mingo some codes. [The Petitioner] then gave Mingo code number 0266481705 and said, "The sender is Luis Alvarado Hernandez." [The Petitioner] also gave "Chayo" as the recipient. [The Petitioner] gave "Mingo" a second code number of 5045563544 for the same amount, and he indicated that the sender was co-defendant Perez, and Mingo was the recipient. [The Petitioner] indicated that both wire transfers were sent "Western Union, Elektra." The numbers and senders of the wires transfers corresponded with the chart prepared by Special Agent Mabry and Count Six of the indictment.

Calls from May 9, 2010
Call # 1084, 4:43 p.m. Central Time

12

[The Petitioner] called "Danny" and said that he would give Danny the code. The call ended while Danny was looking for a pen.

Call # 1085, 4:44 p.m. Central Time
Danny called [the Petitioner] back, and [the Petitioner] gave him a code number of 271018133220 and the name of co-defendant Perez. [The Petitioner] also mentioned an amount of 1,926. Danny also asked for [the Petitioner's] address to send him the "recipe book." Special Agent Mabry testified that the numbers given by [the Petitioner] and Danny related to wire transfers.

Calls from May 26, 2010
Call # 2857, 6:10 p.m. Central Time
[The Petitioner] called co-defendant Gerardo Torres. Co-defendant Torres told [the Petitioner] that he had just arrived in a car, and [the Petitioner] said that "Yahaira" would give him five pesos. [The Petitioner] then said that he would give Yahaira's number to co-defendant Torres. Special Agent Mabry testified that a peso is worth approximately a penny in U.S. currency. Based on his training and experience, he concluded that Yahaira would be giving codefendant Torres $500 rather than five pennies, "just based off of the wire transfers" and a receipt that was found for $500. He said that [the Petitioner] and co-defendant Torres were talking in code.

Call # 2862, 7:01 p.m. Central Time
[The Petitioner] called co-defendant Torres and asked if the "girl" had called him, and codefendant Torres replied, "Yeah she call[ed] me." Co-defendant Torres further stated "that in a half an hour she would wait for him at Cazuelas." [The Petitioner] then said, "When you grab that, tell me so I can do something."

Call # 2863, 7:16 p.m. Central Time
Co-defendant Torres called [the Petitioner] and said, "I [,] have them with me." [The Petitioner] then told him to go to the "Arabic store" and send a "little money" to "by where the girls are." [The Petitioner] and co-defendant Torres agreed that co-defendant Torres would go to "Limber [spelled phonetically]." Special Agent Mabry testified that there is a Linbar Road in Nashville near [the Petitioner's] residence on Arapaho Drive.

Call # 2864, 7:21 p.m. Central Time
Agent Mabry testified that during a call between [the Petitioner] and co-defendant Torres, the following exchange took place:

13

[Co-defendant] Torres says, Buddy, now, now yes. Tell me how much, how much are you going to send to take out from here?

[The Petitioner] says, Send, um 400, 490.

[Co-defendant] Torres says, 490?

And [the Petitioner] responds with, Yes or 480 send, no more. The—you are going to send 480 but take out 500.

[Co-defendant] Torres says, Because there is here three packet of five's but it look out one—I took out one. Three packet of five's but I took out one.

And [the Petitioner] responds, Yes, exactly. Well the one you took from there.

[Co-defendant] Torres replies, Yes.

[The Petitioner] says, Put four of—do you have something to write the names of the girl?

And [co-defendant] Torres replies, no wait that is why, let me, let me, let me. I have to count the money there. I am going to go inside the store and I will tell you.

[The Petitioner] responds with, Just clear well that and put it in the car.

[Co-defendant] Torres replies, Uh-huh. That is fine.

* * *

[The Petitioner] responds with, Is it real bulky?

[Co-defendant] Torres responds with, No, almost no. It's pure twenty's.

14

[The Petitioner] responds with, If it's to much to put in the bag — it doesn't fit all in the bag up front?

[Co-defendant] Torres says, No. But that is fine.

[The Petitioner] responds with, It is well secured?

[Co-defendant] Torres says, Yes.

[The Petitioner] then gave co-defendant Torres the name of Azusensa Morales and told him to "send it to the City of Cuauhtemoc" by Intermex or "send via Soriana."

Call # 2865, 7:29 p.m. Central Time
Co-defendant Torres told [the Petitioner] that he had the tracking number and asked if [the Petitioner] wanted it while they were on the phone or when Mr. Torres arrived home. [The Petitioner] indicated that he was talking on another line and would call back. Special Agent Mabry testified that it appeared from the conversation that [the Petitioner] and co-defendant Torres lived together at the time.

Call # 2882, 8:23 p.m. Central Time
[The Petitioner] called co-defendant Torres and said, "Hey are you bringing the tracking number there?" Co-defendant Torres replied, "Yes, buddy but I am driving. Do, do you want the tracking number or what?" [The Petitioner] then asked how long it would be until codefendant Torres arrived home. He ultimately told co-defendant Torres to give him the tracking number at the house.

Call # 2896, 9:30 p.m. Central Time
[The Petitioner] received a call from "Mingo," and gave Mingo a tracking number of K271018279991. [The Petitioner] indicated an amount of 6,235, and the sender would be Geraldo Vargaran–Torres. He directed Mingo to collect it in Soriana, a state in Mexico.

Call # 2900, 9:39 Central Time
[The Petitioner] received a call from "Cesar, Juanitos brother." Cesar said, "I was talking to the 'namesake,' and he said to give you an account number so you can deposit first thing tomorrow the $2,500, and so you can send the money to Guadalajara for $1,000."

15

Call # 2901, 9:40 Central Time
[The Petitioner] called Cesar who said,

> I spoke with him, and he already knows. If you want, you call and ask him. [Unintelligible] an account, with a Bank of America. So you can deposit tomorrow 2,500, and the other $1,000 you can send by Western Union, by Electra to Guadalajara.

Call # 2903, 9:41 Central Time
[The Petitioner] called Cesar and said, "Give me the account number." Cesar gave him a Bank of America account number of 8580517 in the name of co-defendant Lazaro Baez. Special Agent Mabry testified that the account number was the same number that he had seen written down on a piece of paper found at [the Petitioner] residence on Roy Cole Road in Springfield. The purpose of the call was for a deposit of $2,500.

Sergeant Adrian Breedlove, a detective with the Brentwood Police Department assigned to the DEA, received a call from his supervisor on May 28, 2010, directing him to the area of Atlas Drive off Nolensville Road in Nashville to look for a tractor-trailer. Sergeant Breedlove drove to the area and saw a tractor-trailer backed up to a small warehouse. He also saw several bales of marijuana being tossed out of the tractor-trailer into a U–Haul truck. Sergeant Breedlove testified:

> I met with Special Agent Mabry and we got together at a location close by, one of the other warehouses close by, and we got our police vests so we were clearly marked as police officers. I got my AR–15 ready, and then when the signal was said to go, several of us in different cars drove into the parking lot.

> As I came up in my vehicle I turned on my blue lights and came down that passenger side of the tractor trailer that was shown in that photograph and ended up there kind of at the back of the trailer, up against the warehouse.

> * * *

> When I first arrived the only person I saw was Duarte. Then as we were getting him, we saw — I saw, myself saw, a

16

couple or three people come out of the trailer, and Mr. Baez was one of the people that came out of the trailer.

\* \* \*

As I was driving up, I saw Mr. Duarte there in the back passenger's side of that trailer as it was backed in, on the side that I was driving up on. As I was driving up and turned my blue lights on, Mr. Duarte — it was almost slow motion the way he did it, but he just kind of reached behind him and started to pull the U–Haul door down just kind of slowly. He just pulled the thing down, and he turned back around and looked at me.

Sergeant Breedlove took photographs of the scene and helped get the bales of marijuana that were still in the tractor-trailer. A total of eighty-seven bales of marijuana were seized. On cross-examination, Sergeant Breedlove testified that [the Petitioner] and codefendant Torres were not present at the warehouse.

DEA Special Agent James West transported the marijuana to the Metro Nashville Police Department's property room where he inspected and weighed each bale of marijuana. He also took core samples from ten randomly selected bales that were then sent to the DEA lab for testing. The gross weight of the marijuana seized, including the wrapping, was 1,037 pounds. Greg Burgess, a forensic chemist with the DEA lab, tested the samples which proved to be marijuana.

Detective Merrill Beene, of the Murfreesboro Police Department and also assigned to the DEA, testified that he conducted surveillance on the Atlas Drive warehouse prior to the drug seizure. He drove to Green Mountain Transportation, located on a hill, in order to observe the warehouse. Detective Beene could see the backside of the warehouse and observed the U–Haul truck pull in. He said:

[T]he male exited the U–Haul truck and opened the gate, and then he closed the gate back. He drove to the far-right door, and he walked to the middle door, it's a door that you open, and unlocked the door and went inside, then he opened up the big door and then drove inside.

17

Detective Beene testified that the man remained inside the warehouse for approximately one hour until a white Escalade and a tractor-trailer arrived. The bay door opened, and the tractor-trailer backed up to the door. Four or five minutes later, a "blue Sunfire vehicle" arrived and a black male and a white male exited that vehicle. The white male remained at the warehouse for "maybe a minute or two" and then got back into the car and drove away. Detective Beene testified that the tractor-trailer driver then exited his truck, and everyone proceeded to the back of the tractor-trailer and the U–Haul truck. Detective Beene then saw objects being thrown from the tractor-trailer into the U–Haul. He transmitted his observations to the other officers involved in the investigation. Detective Beene testified that when he arrived at the warehouse, everyone had been taken into custody.

*Flores*, 2013 WL 3497644, at *1-13. Based upon this evidence, the jury convicted the Petitioner of one count of conspiracy to sell 300 pounds or more of marijuana in a school zone on September 1, 2009, one count of possession with intent to deliver 300 pounds or more of marijuana in a school zone on May 28, 2010, one count of money laundering occurring on March 1, 2010, and ten counts of money laundering committed in May 2010. The trial court sentenced the Petitioner to a total effective sentence of fifty-six years in the Tennessee Department of Correction. On appeal, this Court affirmed the Petitioner's convictions and sentence. *Id*. at *1.

## B. Post-Conviction Proceeding

In 2013, the Petitioner filed a petition for post-conviction relief claiming that his trial counsel ("Counsel") was ineffective for failing to adequately prepare for trial, effectively communicate with him, or provide him with discovery materials. He also stated that Counsel was ineffective during the trial by falling asleep during the proceedings. He noted that Counsel was subsequently disbarred for fraudulently billing the State for hours spent representing indigent clients. The Petitioner contended that Counsel's representation prejudiced him.

The post-conviction court held a hearing on the petition, during which the following evidence was presented: The Petitioner testified that he did not think that he had effective representation at his trial. He said that he and Counsel "never had a conversation." The Petitioner recalled that he had been confined for sixteen months before his trial and said that Counsel never came to see him. The only time that the two spoke was during court appearances for only five or ten minutes. He estimated that during the total pendency of his case he and Counsel did not speak for even an hour. He further stated that he sent Counsel letters, but that he never received a response. The

Petitioner said that he and Counsel never discussed developments in his case or the State's evidence.

The Petitioner testified that he contacted the Board of Professional Responsibility ("BPR") regarding Counsel's representation and specifically that Counsel was not communicating with him. The BPR forwarded his letter of complaint to Counsel, who ignored it. The Petitioner said that he asked Counsel during a court appearance for his discovery, but Counsel simply showed him a "disk." The Petitioner said he finally received his discovery in April 2012, after he had been sentenced, and an attorney other than Counsel sent it to him.

The Petitioner testified that Counsel did not prepare him for trial. He said that Counsel also fell asleep during his trial. The Petitioner testified that Counsel never filed a motion challenging the informant's reliability. The Petitioner also stated that Counsel relayed to him the State's plea offer of twenty-five years, to be served at 30%. The Petitioner initially rejected this plea, hoping that the State would make a lower offer. He said that, when he discovered that Counsel was not working on his case, he wanted to sign the plea agreement, and he informed Counsel of this fact.

The Petitioner testified that Counsel was disbarred after his trial for fraudulently reporting hours that he had worked.

During cross-examination, the Petitioner testified that, at trial, one of his co-defendants was found "not guilty" while he and the other co-defendant were found guilty.

The Petitioner agreed that, at the time of his arrest, he had been deported by the United States government for being convicted of a felony and told not to return. He reentered the country anyway.

The Petitioner said that in the discovery materials he found "several" things that would have aided his defense. The first was that one of the charges against him was possession, and he never possessed anything. He said he understood that he was charged with conspiracy, but he said he was unsure whether that meant that he had to touch the drugs to be in possession of them. He said that there were also calls in the discovery that he supposedly made to Atlanta, but he never made those calls. The Petitioner was unsure whether the jury heard these calls as evidence. He said, however, that he would have liked to have reviewed the discovery with Counsel.

The Petitioner testified that he did not make the trial court aware when Counsel dozed off.

19

Kelly Young, one of the prosecutors involved in the Petitioner's case, testified that the Petitioner was tried at the same time as two of his co-defendants. Mr. Young recalled Counsel being appointed to represent the Petitioner, and he recalled the other attorneys appointed to represent his co-defendants. Mr. Young stated that the State offered the Petitioner twenty-five years, to be served at 30%, in exchange for a plea of guilty. He made this same offer to his co-defendants. Mr. Young said that he provided Counsel with discovery but there was nothing in the discovery that he would consider "exculpatory evidence."

Mr. Young agreed that the State did not present evidence that the Petitioner actually touched or handled the drugs; rather that he was in charge of the money aspect of the transactions by conducting wire transfers of money and other activities. Mr. Young said that he did not introduce into evidence any call between the Petitioner and the Mexican Consulate in Atlanta.

Mr. Young testified that, at sentencing, the State argued for an enhanced sentence based upon the fact that the Petitioner had been deported for committing a felony and knowingly returned to the country and engaged in further criminal activity.

Mr. Young said that he never observed Counsel fall asleep during trial. He said that Counsel would lean back but that he appeared to be paying attention. Mr. Young testified that he and Counsel discussed the overwhelming amount of evidence against the Petitioner. Mr. Young said that, at one point, Counsel indicated that the Petitioner wished to accept the plea offer. The offer, however, was dependent upon one of the co-defendants also entering a plea of guilty. The co-defendant did not agree to enter a guilty plea, so the plea negotiations stalled.

During cross-examination, Mr. Young testified that he was unsure whether Counsel challenged the State's independent verification of the transcripts of the translation of the recorded phone calls.

The post-conviction court entered a memorandum order, finding:

> The Petitioner contends that counsel was ineffective for failing to provide discovery and review evidence with Petitioner. The Petitioner specifically argues in his written petition that counsel failed to provide a copy of discovery and review the evidence with the petitioner or convey to him any plea offers for pre-trial settlement.
>
> Petitioner alleges that Counsel failed to provide a copy of discovery for him to review and failed to review the evidence with Petitioner.

Petitioner testified at the evidentiary hearing that he was only able to obtain a copy of discovery after his conviction and by contacting a different attorney for assistance. However, Petitioner, having had access to the discovery for his case for a number of years, was unable to testify as to how he was prejudiced by denial of access to the discovery in his case. He raises the issue of the record of a single phone call contained in the wiretap evidence in this case, specifically a call to the Mexican Consulate in Atlanta, Georgia. Petitioner denies making this call. However, Kelly Young, one of the prosecutors for the State at the trial in question, testified at the evidentiary hearing that no such call was introduced in evidence by the State at trial, There were a multitude of other wiretap calls that were presented at trial and Petitioner fails to show how this call, if it was introduced, resulted in prejudice. This issue is without merit.

Petitioner testified at the evidentiary hearing that Mr. Lane had conveyed an offer of twenty-five (25) years to serve at 30%. Petitioner further testified that he did not initially accept the offer in hopes of a more favorable resolution, but that at some point before the date of trial he did want to accept the offer. Mr. Young testified at the evidentiary hearing that the offer was contingent on acceptance of the offer by one of Petitioner's co-defendants, who did not choose to accept his offer.

The following principles are inherent within this State's acceptance of contingent plea agreements. There is no constitutional right of an accused to plea bargain, and there is no duty of the State to engage in plea negotiations. 22 C.J.S. Criminal Law § 3.66 (1989); *Risner v. State*, 88 of392 2003 Tenn. Crim. App., *13-14 (Tenn. Crim. App. June 30, 2003). The State, as well as the persons accused, is entitled to have its rights protected and, when several persons are charged jointly with a single crime, the State is entitled to have the fact of guilt determined and punishment assessed in a single trial, unless to do so would unfairly prejudice the rights of the defendants. *Id.* (citing *Woodruff v. State*, 164 Tenn. 530, 51 S.W.2d 843, 845 (Tenn. 1932)). Petitioner does not contest the plea offer itself, only that Counsel failed to successfully negotiate a non-contingent offer. The court finds no deficiency of Counsel here.

. . . .

The Petitioner argues that counsel was ineffective for sleeping periodically throughout the jury trial. However, no testimony or evidence was presented at the evidentiary hearing on this matter concerning missed

objections or other possible prejudice against the Petitioner. Mr. Young did testify at the evidentiary hearing that he did not observe Mr. Lane sleeping during the course of the trial. Crediting the testimony of Mr. Young and without any evidence or testimony presented to show how counsel's alleged periodic sleeping prejudiced Petitioner; the Court finds this issue to be without merit.

The post-conviction court denied the Petitioner's petition. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition because the proof was "unchallenged" that Counsel failed to visit with the Petitioner or prepare him for trial. The Petitioner further contends that Counsel was ineffective because he did not respond to the Petitioner's letters, failed to provide him with discovery materials, and fell asleep during the trial. He notes that Counsel was disbarred after his trial. The State counters that the Petitioner failed to prove that Counsel's representation was deficient or that he was prejudiced. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6

S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to

23

matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In the case under submission, we conclude that the post-conviction court did not err when it determined that the Petitioner had not proven by clear and convincing evidence that he had received the ineffective assistance of counsel. The Petitioner contends that his claims are unchallenged, but the post-conviction court found the testimony of one of the prosecutors, Mr. Young, compelling. Mr. Young testified that he did not observe Counsel sleeping during the trial and that it seemed that Counsel was paying attention.

As to the Petitioner's other claims, we conclude that he has not proven that he was prejudiced. The evidence against him at trial was overwhelming. He was heard on multiple phone calls ordering that money be transferred to different people involved in the drug investigation. He secured a facility for the drugs, and he clearly held a role in the drug organization. The Petitioner failed to show how receiving the discovery at an earlier date would have aided in his defense. He similarly failed to show how communicating with Counsel more frequently or being better prepared for trial would have aided him. Counsel presented the only plea offer given by the State to the Petitioner, but the offer included that one of the Petitioner's co-defendants also plead guilty. The Petitioner's co-defendant refused to so do, and the offer expired. Further, the Petitioner has failed to show a connection between Counsel's subsequent disbarment and the Petitioner's claims of ineffective assistance of counsel.

We conclude that the Petitioner has not proven that Counsel was ineffective and that he was prejudiced by this ineffective representation. As such, we affirm the post-conviction court's denial of the Petitioner's petition for post-conviction relief. He is not entitled to relief.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE